## SECOND NAT. BANK OF TOLEDO v. M. SAMUEL & SONS, Inc.

(Circuit Court of Appeals, Second Circuit. May 10, 1926.)

No. 50.

**1. Banks and banking ⬦191.**

Delay for one day in presenting draft against letter of credit, due to unusual and unexpected delay in transmission of mail, *held* excusable, in view of Negotiable Instruments Law N. Y. (Consol. Laws N. Y. c. 38) § 141.

**2. Banks and banking ⬦191—"Letter of credit" is in nature of negotiable instrument, and is letter whereby one requests another to extend credit to a third agreeing to repay the advancement.**

A letter of credit is in nature of a negotiable instrument, and is a letter whereby a person requests another to advance money or give credit to a third person, and promises to repay person making advancement.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Letters of Credit.]

**3. Torts ⬦12.**

It is actionable wrong to procure breach of contract.

**4. Torts ⬦1.**

Tort-feasor has obligation of compensating person injured, and, if enriched by his tort, to make restitution either in specie or value.

**5. Assumpsit, action of ⬦8—Purchaser of goods, furnishing irrevocable letter of credit, and later inducing bank to wrongfully refuse payment of draft drawn against such credit, held liable at law in indebitatus assumpsit.**

Purchaser of goods, furnishing irrevocable letter of credit, and later advising bank not to pay draft against such credit, presented one day after time allowed therefor, though delay was excusable, *held* to have wrongfully induced bank to breach its contract, and liable to holder of draft in action at law in indebitatus assumpsit.

**6. Equity ⬦46—Holder of draft drawn against irrevocable letter of credit held to have adequate remedy at law, against person procuring letter, for wrongfully inducing bank to refuse payment of draft.**

Holder of draft drawn against irrevocable letter of credit *held* to have complete and adequate remedy at law, against person procuring letter, for inducing bank to wrongfully refuse payment of draft, and not entitled to relief in equity.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit by the Second National Bank of Toledo against M. Samuel & Sons, Inc. From a decree dismissing the complaint without prejudice, plaintiff appeals. Reversed and remanded, with directions.

This cause comes here on appeal from a decree entered in the United States District Court for the Eastern District of New York, which dismissed the complaint herein for want of equity.

The plaintiff, as its name indicates, is a national banking corporation organized under the laws of the United States, and is engaged in the business of banking in the city of Toledo, in the state of Ohio. The defendant is a corporation organized under the laws of the state of New York, and it has its principal office for the transaction of business in the borough of Brooklyn, in the city and state of New York, and it is engaged in the business of buying, selling, and dealing in scrap metal. The jurisdiction depends on diversity of citizenship and the allegation that the value of the property right in question is more than $3,000.

It brought this suit in equity and filed an amended bill of complaint. The defendant filed an answer, portions of which answer the plaintiff moved to strike out. And the defendant also moved for judgment on a distinct defense, which it pleaded. The court ordered certain parts of the complaint stricken out, and then ordered the complaint dismissed without prejudice and without costs. The facts are stated in the opinion.

Morris, Plante & Saxe, of New York City (Merton E. Lewis, of New York City, of counsel), for appellant.

Morris D. Kopple, of New York City (Herbert D. Cohen, of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). It appears that the War Department of the government of the United States on October 17, 1922, sent to dealers in metal scrap material a circular letter soliciting bids for the purchase of about 1,880 gross tons of Stokes trench mortar shells scrap and trench mortar fuse bodies scrap, then at the Ordnance Reserve Depot at Toledo, Ohio. It required all bids to be presented at the Toledo depot on or be-

fore November 13, 1922. The defendant submitted its bid within the specified period, and its bid was accepted, and the material was awarded to the defendant.

In the circular letter inviting bids the defendant was fully advised that the material was to be sold " 'as is, where is,' and that quantities, condition, description, weight, etc., are in no wise guaranteed by the government." The circular letter also advised that before the submission of a bid the bidder should inspect the material. He was also informed that full opportunity to make such inspection would be given. It also advised him that the successful bidder would be required to furnish an irrevocable letter of credit in an amount equal to 90 per cent. of his bid.

The defendant on November 17, 1922, applied to the Irving National Bank of the city of New York for a letter of credit in the sum of $28,527.12 in favor of G. S. Lavin, then the commanding officer of the Ordnance Reserve Depot at Toledo, against drafts to be drawn by said commanding officer at sight within 60 days from the date thereof, upon invoices in payment of the purchase price of the 1,880 gross tons of scrap, the letter of credit to expire on January 17, 1923. On the day following this application the Irving National Bank issued the letter of credit found in the margin.[1]

---

[1] Irving National Bank, New York. Organized 1851.

Cable Address: "Irvingbank New York." Commercial Credit—Import.

November 18, 1922.

Irrevocable Letter of Credit No. 27439.

Mr. G. S. Lavin, Captain Ordnance Dept., Commanding Officer, Toledo Ordnance Reserve Depot, Toledo, Ohio—Dear Sir: You are hereby authorized to draw on the Irving National Bank, New York, at sight, before sixty (60) days from date, for account of M. Samuel & Son, Inc., New York City, for any sum or sums, not exceeding in all twenty-eight thousand five hundred twenty-seven and 12/100 dollars ($28,527.12). Your drafts to be accompanied by invoice covering one thousand eight hundred eighty (1,880) gross tons Stokes trench mortar shells scrap and trench mortar fuse bodies scrap sale No. T D 33, and must be presented in New York not later than January 17, 1923.

All drafts must be marked: "Drawn under Irving National Bank, New York, irrevocable credit No. 27439, dated November 18, 1922," and the amounts drawn indorsed on the reverse hereof by the negotiating bank. We hereby agree with the drawers, indorsers, and bona fide holders of the drafts, drawn under and in compliance with the terms of this credit, that the same shall be duly honored by the above-named drawees on presentation and surrender of the documents.

Very truly yours,

[Signed]   C. Wolff, for Assistant Manager.

On November 23, 1922, the War Department accepted the defendant's bid and awarded to it the shells scrap and fuse bodies at the agreed price of $16.86 per gross ton. Thereupon defendant paid to the War Department $3,169.68 and also delivered to it the letter of credit above mentioned, and thereafter from time to time defendant took over and disposed of the material which had been awarded to it. The Irving National Bank, acting under direction of defendant, extended the expiration date of the letter of credit from January 17, 1923, to and including February 1, 1923. It at the same time notified the commanding officer at the Ordnance Reserve Depot at Toledo of the fact of the extension.

The defendant, having received a large quantity of the scrap which had been delivered to it by the commanding officer at the Reserve Depot at Toledo, drew a draft for $20,049.52 in accordance with the terms of the letter of credit, which was purchased by plaintiff at its par value, forwarded to the Irving National Bank for payment, and paid. On January 31, 1923, all the scrap contracted to be sold to defendant had been delivered, and the commanding officer at the Toledo depot presented to plaintiff his draft, dated that day, for $8,038.73, drawn on the Irving National Bank in accordance with the letter of credit, and requested plaintiff to purchase the same, which the plaintiff did, paying him the face amount thereof.

Upon the same day plaintiff purchased the draft it forwarded by mail to the Irving National Bank at New York in a sealed, stamped, and properly addressed envelope, which it deposited prior to 5:30 o'clock in the afternoon in the general post office at Toledo. Mail so deposited was, as plaintiff knew, due to arrive in New York at 9:40 o'clock in the morning of the following day, and was customarily delivered to the bank and paid prior to 3 o'clock in the afternoon of the same day; but on this occasion it happened that the draft was not delivered to the bank until the morning of February 2, 1923, which was the day after the letter of credit expired. It is alleged that on receipt of the draft on February 2d the Irving National Bank at once communicated with defendant and requested its authority to pay the amount thereof to the plaintiff, but that defendant declined to consent thereto, and it was returned unpaid to the plaintiff, and is now held by it.

The plaintiff thereupon commenced this suit, alleging that it had no adequate remedy at law, and that a court of equity should com-

pel the defendant either to deliver up and surrender to it the merchandise covered by the invoice accompanying the draft at the time the draft was presented to the Irving National Bank for payment, and which was of the value of $8,038.73, which merchandise defendant would not have obtained, except for the purchase of the draft by the plaintiff, or in the alternative the defendant should be required to account to the plaintiff for the proceeds of the sale in the sum of $8,038.73, with interest thereon from January 31, 1923.

The defendant in its answer alleged that it paid the government of the United States for the merchandise purchased from it by the payment of $3,169.68 cash and the delivery of the letter of credit in the amount of $28,527.12. It further alleged that the purchase by plaintiff of the draft of $8,038.73 was solely for plaintiff's own use and accommodation in the course of its own business, and for its own profit, and not for the defendant's accommodation. It specifically denied that it refused to permit the Irving National Bank to pay the draft herein involved, and alleged that the said bank was at liberty to pay it, if it chose so to do, and it alleged that the plaintiff's remedy, if any, is against the Irving National Bank, which issued the letter of credit.

The letter of credit was issued, not to the defendant, but to the commanding officer of the Toledo Ordnance Reserve Depot. It authorized him to draw at sight on the Irving National Bank for any sum or sums not exceeding the amount named therein, and the bank thereby expressly agreed "with the drawers, indorsers, and bona fide holders of the drafts, drawn under and in compliance with the terms of this credit, that the same" would be duly honored by it on presentation and surrender of the documents.

The plaintiff is a bona fide holder of a draft drawn by the commanding officer of the Toledo Ordnance Reserve Depot. He had the right to draw it, and the plaintiff purchased it from him, paying him the face amount thereof. It thereby acquired good title to the draft and was entitled to the payment thereof from the Irving National Bank on its presentation to it under the conditions specified in the letter of credit, as modified subsequently by extending the credit "until February 1st." The draft was not presented to the bank, however, until the morning of February 2d, although it was deposited in the mail on January 31st, and would have been delivered to the bank on the following day, before the close of banking hours on February 1st, and so within the time specified in the contract, had it not been for the unusual and unexpected delay in the transmission of the mail, and for which the plaintiff was in no way responsible.

The question which this state of facts raises is whether this unexpected and unforeseen delay in the transmission of the draft by mail, and which was not occasioned by the plaintiff's negligence, and for which it was in no way responsible, excuses the failure to make presentment of the draft on February 1st.

In Windham Bank v. Norton, Converse & Co., 22 Conn. 213, 56 Am. Dec. 397, a case decided in 1852, a bill of exchange was drawn at Norwich, Conn., on the defendants, and was payable at a bank in Philadelphia, Pa. The bill had been accepted by defendants, and they procured the plaintiff bank to discount it, and they had indorsed and delivered it to the bank. The bank deposited the draft in the post office, to be forwarded to Philadelphia. The officials at the post office, by mistake, deposited the mail intended for Philadelphia in mail bags marked for Washington, and while the mail arrived in Philadelphia in time, it was not delivered there, but was carried on to Washington. Then the mistake was discovered, and the Philadelphia mail was sent back to that city. It arrived too late to permit the presentation of the draft on the day it was due. The court held that the failure to make presentment in time was due to an accident not attributable to the holder, and that presentment on the day following was therefore sufficient, and that plaintiff was entitled to judgment. This was an action at law, the plaintiff having sued in assumpsit.

In 6 C. J. 682, the law is stated as follows: "The general rule is that the failure to present a bill or note in due time for payment and to give notice of its nonpayment will be excused by accident or misfortune not attributable to the fault or voluntary act of the holder, that makes it impracticable or impossible to perform such acts, provided the holder makes presentment or gives notice as soon afterward as he is able. * * * However, an accident, a mistake, or an unwarranted interference by mail authorities with a notice passing through their hands in due course of mail is a good excuse for delay, as where by mistake a postmaster misdirects the package of mail matter containing the bill or the note; but if the delay is caused in part by the holder's mistake in addressing the drawee, presentment in proper time will not be excused."

The rule as above laid down is supported by the authorities. Windham Bank v. Norton, 22 Conn. 213, 56 Am. Dec. 397; Young v. Exchange Bank, 152 Ky. 293, 153 S. W. 444, Ann. Cas. 1915B, 148; Labadiole v. Landry, 20 La. Ann. 149; Jex v. Tureaud, 19 La. Ann. 64; Harp v. Kenner, 19 La. Ann. 63; Moody v. Mack, 43 Mo. 210; Morrison v. McCartney, 30 Mo. 183; Linville v. Welch, 29 Mo. 203; Adams v. Darby, 28 Mo. 162, 75 Am. Dec. 115; Carter v. Jennings, 134 Miss. 263, 98 So. 687.

In 4 Am. & Eng. Encyc. of Law, p. 365, the law is stated as follows: "Presentment for payment within the regular time will be excused, where it is prevented by circumstances interrupting intercourse, or by unavoidable accident not referrable to the negligence of the holder." And on page 366 it is said: "Also where a bill or note is transmitted through the mails for payment, a delay caused by the mistake of a postmaster, as where he misdirects the package of mail matter containing the bill or note, will be excused."

And the Negotiable Instruments Law of the state of New York (Consol. Laws, c. 38, § 141) reads as follows:

"*When Delay in Making Presentment is Excused.* Delay in making presentment for payment is excused when the delay is caused by circumstances beyond the control of the holder and not imputable to his default, misconduct or negligence. When the cause of delay ceases to operate, presentment must be made with reasonable diligence."

And in Daniel on Negotiable Instruments (6th Ed.) vol. 1, § 654a, in speaking of the transmission of bills of exchange for presentment by mail, it is said to be "undoubtedly legal, customary, and proper to forward them by mail to correspondents or other agents at the place where the drawee is addressed, to be by them presented in due course; and in such cases if by accident or default in the postal service they are not received in due time to be presented at maturity, the delay occasioned is excused, and the drawer and indorsers are held liable, provided that, when the delay is over, due diligence is exercised in making the presentment afterward."

[1] The delay in making presentment in this case was caused by circumstances beyond the control of the plaintiff, and was not imputable to its default, misconduct, or negligence, and was therefore excusable. In accordance with the authorities, and upon principle, we are alike satisfied that the presentment made to the Irving National Bank was under the circumstances in time, the delay in presentment not being due to the negligence of the plaintiff.

Moreover, if this draft was entitled to days of grace, its presentment on February 2d was in due time in any event. In Daniel on Negotiable Instruments (6th Ed.) vol. 1, § 617, in discussing what instruments are by the law merchant entitled to grace, it is said: "And we have no hesitation in saying, in concurrence with the doctrine expressly stated, or to be derived from what is said by Chitty, Byles, Maxwell, Roscoe, Edwards, Story, Parsons, Kent, and others, that negotiable instruments payable at sight are, and should be, entitled to grace, though there is respectable authority and opinion to the contrary. The weight of authority in the United States is to this effect."

We have no doubt that the draft herein involved is a negotiable instrument, and Mr. Daniel in the section above quoted says: "It seems clearly reasonable that bills at sight should have grace, as they are never presented for acceptance but for payment and the theory of indulgence to the drawee, upon which grace is allowed upon drafts payable at a specified time after date, or after sight, would apply with greater force to those payable at sight."

[2] A letter of credit is a letter whereby one person requests some other person to advance money or give credit to a third person, and promises to repay the same to the person making the advancement. It partakes of the nature of a negotiable instrument. See Liggett v. Levy, 233 Mo. 590, 136 S. W. 299, Ann. Cas. 1912C, 70; 7 C. J. 594, § 237.

The law regarding the sanctity of contracts has been long established and rests upon "a solid foundation of reason and justice." As was said in Dermott v. Jones, 2 Wall. 1, 8, 17 L. Ed. 762, the law requires parties to do what they have agreed to do. "If unexpected impediments lie in the way, and a loss must ensue, it leaves the loss where the contract places it. If the parties have made no provision for a dispensation, the rule of law gives none. It does not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated." We shall not depart from that principle.

In this case the contract which the defendants made with the plaintiff's assignor has been fully performed by the latter, but remains in part unperformed by the Irving National Bank, inasmuch as the bank, which issued the letter of credit, acting under de-

fendant's instructions, declined to pay the draft drawn and presented pursuant to its terms. In other words, the defendant wrongfully induced the Irving National Bank to break its contract, which was to pay to the bona fide holder of the draft the amount thereof when presented in accordance with the terms of the aforesaid letter of credit.

The plaintiff has not seen fit to sue the Irving National Bank at law, which it might have done. Instead it has seen fit to bring suit against the defendant, who induced the bank not to comply with its contract. This, in our opinion, it could do, but not in equity, and we will proceed to state our reasons therefor. "Property rights, public and private morality, and liberty itself are insecure, when the law encourages the nonobservance of contract obligations." Citizens' Light, Heat & Power Co. v. Montgomery Light & Water Co. (C. C.) 171 F. 553.

[3] It is an actionable wrong to procure the breach of an existing contract. Contract rights are property, and as such are entitled to the protection of the law, and knowingly to induce one of the parties wrongfully to repudiate a contract is as distinct a wrong as it is to injure or destroy his property. In Temperton v. Russell, [1893] 1 Q. B. 715, 730, Lopes, L. J., said: "I presume that the principle is this, viz. that the contract confers certain rights on the person with whom it is made, and not only binds the parties to it by the obligation entered into, but also imposes on all the world the duty of respecting that contractual obligation." The other judges concurred with him in holding that one who wrongfully induces another to break his contract is liable as for an actionable wrong.

In American Malting Co. v. Keitel, 209 F. 351, 358, 126 C. C. A. 277, 284, this court had occasion to consider at some length the wrong committed by a third party who induces a party to a contract to break it. In that case we said: "It is an actionable wrong for a third party, without justification, to induce a party to a contract to break his agreement." We are still of that opinion. See Heath v. American Book Co. (C. C.) 97 F. 533; Dail-Overland Co. v. Willys-Overland (D. C.) 263 F. 171, 183; Westinghouse Electric & Mfg. Co. v. Diamond State Fibre Co. (D. C.) 268 F. 121, 123; Beekman v. Marsters, 195 Mass. 205, 210, 80 N. E. 817, 11 L. R. A. (N. S.) 201, 122 Am. St. Rep. 232, 11 Ann. Cas. 332; McGurk v. Cronenwett, 199 Mass. 461, 473, 85 N. E. 576, 19 L. R. A. (N. S.) 561; Wheeler-Stenzel Co.

v. American Window Glass Co., 202 Mass. 473, 89 N. E. 28, L. R. A. 1915F, 1076; Tracey v. Osborne, 226 Mass. 29, 114 N. E. 959.

From the days of Lord Mansfield's decision in Moses v. Macferlan, 2 Burr. 1065, decided in 1760, the common-law courts have recognized the right to sue in the equitable action of indebitatus assumpsit to recover money paid by mistake, or if "the defendant upon the circumstances of the case is obliged by the ties of natural justice and equity to refund the money." And as stated in Mr. Woodward's work on Quasi Contracts, § 3, quasi contractual obligations are defined as "arising without reference to the assent of the obligor, from the receipt of a benefit the retention of which is unjust, and requiring the obligor to make restitution." "They rest solely upon the universally recognized moral obligation of one who has received a benefit, the retention of which would be unjust, to make restitution." Id. § 6.

The defendant has entered into no contract with the plaintiff herein. The contract appears to have been with the Irving National Bank, which issued the letter of credit. The defendant procured the Irving National Bank to issue the letter of credit, and it, and not the defendant, was therefore the promisor. While no contractual relation exists between the plaintiff and the defendant, the defendant has assumed a quasi contractual relation with the plaintiff. That relationship grows out of the fact that the defendant received a benefit the retention of which would work a serious injustice to the plaintiff. And this quasi contractual obligation is imposed without reference to the obligor's assent. It is essential to the existence of a quasi contractual obligation that it be shown: (1) That the defendant has received a benefit from the plaintiff. (2) That the retention of the benefit by the defendant is inequitable.

The benefit which the defendant received from the plaintiff's assignor was the merchandise which he turned over to the defendant, and which the latter was to pay for by turning over an irrevocable letter of credit. It was pursuant to that agreement that the Irving National Bank issued its "irrevocable letter of credit," and agreed to pay to the holder of a draft drawn under the latter and presented according to its terms. The retention of the benefit by the defendant is inequitable, inasmuch as the bank, acting under the instructions of the defendant, refused to pay the last draft drawn on the bank, and

which the plaintiff, having purchased, presented to it in accordance with its terms.

It clearly appears in this case that the benefit conferred upon the defendants was due to misreliance on the promise of the defendant that it would furnish an irrevocable letter of credit, which it in fact furnished, but afterwards wrongfully directed the bank not to pay before it had been paid in full. The assumption that the letter of credit would be paid in accordance with its terms, therefore, turned out to be erroneous; and the goods were delivered by the plaintiff's assignor, and the draft was purchased and the money paid by the plaintiff under a mistake "of anticipated fact." The result is that the defendant, who revoked the letter of credit, has in its hands the merchandise, for which it has not paid in full, and for which, in equity and good conscience, it is liable in quasi contract to the plaintiff in the sum of $8,038.73, with interest thereon from January 31, 1923, that being the date upon which the draft was payable by the Irving National Bank.

As there is no question but that defendant has received property for which it has not paid, and the retention of which is an injustice, there is a clear moral obligation to make restitution to the plaintiff, who parted with its money under a mistake of fact and in reliance upon a letter of credit, which was, upon its face, irrevocable, but which the defendant induced the bank wrongfully to revoke.

[4] Upon the commission of a tort an obligation rests upon the tort-feasor to compensate the person injured. The commission of a tort not only results in damage to the person injured, but often in a benefit to the tort-feasor. It so resulted in this case, as the defendant benefited to the extent of the draft which remained unpaid; and whenever the tort-feasor is so enriched he is under a clear moral obligation (aside from the obligation to pay damages) to make restitution either in specie or in value. And this obligation may be enforced against the tort-feasor in an action of indebitatus assumpsit. Woodward on Quasi Contracts, § 270.

It has been held that, where the remedy by assumpsit is full and complete, the resort must be to that action and not to a suit in equity. Wolf v. Irons, 8 Ark. 63; Canfield v. Johnson, 144 Pa. 61, 22 A. 974; Fanning v. Chadwick, 3 Pick. (Mass.) 420, 15 Am. Dec. 233. And in Gaines v. Miller, 111 U. S. 397, 4 S. Ct. 426, 28 L. Ed. 466, the court, sustaining a demurrer to a bill in equity, said: "Whenever one person has in his hands money equitably belonging to another, that other person may recover it by assumpsit for money had and received. * * * The remedy at law is adequate and complete."

In Knapp v. Hobbs, 50 N. H. 476, 478 (1871), the court, after stating that, in order to support the count in assumpsit there must be privity of contract, said: "But there need be no other privity of contract in order to support this action than that which results from one man's receiving another's money which he has no right conscientiously to retain. In such a case the law and the equitable principle upon which the action is founded imply the contract and the assumpsit. Mason v. Waite, 17 Mass. 563; Hall v. Marston, Id. 579; Penniman v. Patchin, 5 Vt. 346."

[5, 6] There is, then, a plain remedy at law in indebitatus assumpsit. The Irving National Bank by its letter of credit contracted with plaintiff's assignor to pay drafts drawn under it, and pursuant to its terms and at the same time agreed expressly to pay the bona fide holders of any such draft. The defendant, by inducing the bank to break that contract, made itself liable at law to any bona fide holder of a draft so drawn, and therefore to this plaintiff. There being an unquestionable remedy at law, and that remedy being adequate, the bill in equity should be dismissed, and the cause transferred to the law side of the court.

The order dismissing the complaint is reversed, and the cause remanded to the District Court, with directions to reinstate the complaint and transfer the case to the law side, and proceed therewith in accordance with rule 22 of the Equity Rules promulgated by the Supreme Court, and in accordance with the principles laid down in this opinion.