### EASTERN STATES PETROLEUM CO., Inc., v. ASIATIC PETROLEUM CORPORATION et al.

### No. 275.

Circuit Court of Appeals, Second Circuit.

April 10, 1939.

Cravath, De Gersdorff, Swaine & Wood, of New York City, for defendants-appellants Asiatic Petroleum Corp., Harold Wilkinson and Anglo-Mexican Petroleum Corp.

Root, Clark, Buckner & Ballantine, of New York City (John M. Harlan and Leslie H. Arps, both of New York City, of counsel), for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from an order granting a motion for an injunction pendente lite in an action to recover treble damages for the alleged violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., and the

Clayton Act (38 Stat. 730). 15 U.S.C.A. § 15. The injunction, which was sought and granted under the provisions of 15 U.S.C. A. § 26, prohibited the appellants from interfering with the performance of contracts made by the plaintiff respecting the sale, transportation or delivery of products dealt in by the plaintiff and from using threats, commands, force or coercion to prevent others from purchasing plaintiff's products. The breadth of the general restraining language of the injunction was narrowed, however, so as to permit "(1) the bringing of suit by Mexican Eagle Oil Company or any assignee to recover the oil, or the value thereof or damages for the retention thereof, heretofore or hereafter shipped to the plaintiff from the Republic of Mexico, or (2) to advertise the fact of the pendency of such litigation, or (3) bring such fact to the attention of the trade in general or any person in it, or (4) to appeal for assistance or redress to governmental bodies".

The plaintiff is a Delaware corporation engaged in the purchase and sale of refined petroleum products and also in refining those products from crude oil at its refinery in Houston, Texas. Its principal office is in the Southern District of New York. Appellant Wilkinson is the president of appellant Asiatic Petroleum Corporation, a Delaware corporation, and of Anglo-Mexican Petroleum Corporation, a New York corporation. The principal office of each of these corporations is in the Southern District of New York. Both of these corporations form part of a large number of corporations which are controlled directly or indirectly by what will here be called the Shell Group, the control of which is traceable to what is known as the Royal Dutch Company, a corporation organized under the laws of the Kingdom of the Netherlands and Shell Transport & Trading Co., Ltd., a British corporation. The defendants who were not enjoined and have not appealed are the Shell Union Oil Corporation, a member of the Shell Group, and Boyce Coppinger of the Asiatic Petroleum Corporation. The Shell Group is engaged extensively, both in this country and abroad, in business which includes the purchase, sale and refining of crude petroleum and the purchase and sale of various products refined and manufactured from crude petroleum in competition with the business of the plaintiff.

This controversy has grown out of the situation in the above mentioned business which has been created by the seizure by the Republic of Mexico, on March 18 1938, of various oil wells in Mexico which were then owned by the Mexican Eagle Oil Company, Ltd., a corporation also a member of the Shell Group which will be herein called Mexican Eagle.

It is undisputed that on the above date the President of Mexico issued a decree, without action by the Mexican Congress, under which the property of Mexican Eagle was expropriated without compensation and seized by the government. The property of Mexican Eagle so seized which is of present concern consisted of fourteen out of a total of eighteen oil wells in the Poza Rica oil field and pipe lines from that field to the Mexican port of Tuxpam. The other four wells then were, and since have been, owned by Petromex Corporation which is owned by the Mexican Government. Since the seizure under the decree of expropriation, the wells in the Poza Rica field have all been producing. The crude oil from all the wells in the field has been commingled and piped.to Tuxpam through the seized pipe lines to be shipped from that port.

The plaintiff, finding it difficult to secure an adequate supply of domestic crude oil at favorable prices for its refinery at Houston, made a contract on August 11, 1938, with a corporation wholly owned by the Mexican Government, here called Distribuidora, for a supply of crude oil. This crude oil has been shipped from Tuxpam out of oil from the Poza Rica field produced from all the wells there and commingled. The total amount shipped under the contract to the plaintiff has not exceeded the amount produced by the wells owned by Petromex before March 18, 1938, and the plaintiff therefore claims that none of the oil from the expropriated wells of Mexican Eagle has been delivered to it but it is doubtful whether such a position is tenable because of the indiscriminate commingling of all of the oil from all of the wells in the field.

The plaintiff has refined the crude oil thus obtained and used the refined products in its export trade. Among the contracts which have been filled in part, at least, out of such refined products is one made by the plaintiff on November 18, 1937, with Harris & Dixon, Ltd., a British corpora-

tion, for the sale of some 120,000 tons of refined products to be delivered in installments between February 1, 1938, and January 31, 1940. The conduct of the defendants in respect to the Harris & Dixon contract is what the district judge relied on as sufficient to entitle the plaintiff to the temporary injunction. This was brought about in the following manner:

It was generally known that Mexican Eagle claimed that its property had been unlawfully seized in Mexico and that the so-called Shell Group objected to the purchase of oil from expropriated wells. In October, 1938, a Mr. van Zonneveld, a director of Harris & Dixon, Ltd., learned in London that the "Stigstad", the steamer which had been chartered to make deliveries of the products under the plaintiff's contract with Harris & Dixon, Ltd., was being watched and that Mexican Eagle might cause her cargo to be seized upon arrival in England. He communicated at once with the British Ministry of Mines and was informed that there were threats by "other quarters" to seize any refined products produced from Mexican oil. He was also told that it was not contrary to British law to import such products and the suggestion was made that he confer with representatives of the Shell Group. By this time Mr. van Zonneveld knew that the British Government did not view with favor the importation of products refined from Mexican oil but that it would not prevent importation. He adopted the suggestion of the Ministry of Mines and had a conference with Mr. Godber of Mexican Eagle on November 4, 1938. He was then told that Mexican Eagle claimed that its crude oil was being used for refining to make the products being delivered to Harris & Dixon, Ltd., under the contract it had with the plaintiff and that the Shell Group intended to seize such cargoes. Mr. van Zonneveld then told Mr. Godber that he was going to New York to find a solution if possible and Mr. Godber replied that if he had occasion "to talk with the Mexican Eagle to go and see Mr. Wilkinson" in New York and gave him Mr. Wilkinson's address there.

Mr. van Zonneveld did go to New York, arriving there on November 10, 1938, and consulted a Mr. Leach of the New York British Consulate who advised him to see Mr. Wilkinson. He later consulted with representatives of the plaintiff and told them that Mr. Leach had been to Washington "to put before the Embassy our very unhappy and very unpleasant situation, and that he could only bring back the answer that the British Government did not like Mexican oil to enter Great Britain and I was asked if I could possibly find a solution so that no more of that oil was going to come in." He also told representatives of the plaintiff that Mr. Leach had suggested that information as to the amount for which the plaintiff would cancel the contract should be obtained. In response to that he was told that it would be $500,000 plus release from their charter. He then reported back to Mr. Leach, who arranged an appointment for him with Mr. Wilkinson for the morning of November 16th.

He then reluctantly called upon Mr. Wilkinson and was informed by him that he was absolutely certain that the plaintiff was handling Mexican Eagle oil, "that it was physically impossible for the Mexican Government to deliver oil in the quantities that they did from their own wells and from their own property, and that the whole world knew quite well that the Eastern States were taking expropriated oils." Mr. van Zonneveld inquired whether, "if we defaulted would they pay the piper, or pay the damages, to which he said definitely no." He told Mr. Wilkinson the amount of probable damages if Harris & Dixon defaulted and Wilkinson said he was not interested but did say that "they could not fight all the battles in the world and that we, as a British firm, should be on the same side of the fence as they were, even from a moral point of view". After asking why the Shell Group would wait to seize the products in Great Britian instead of doing so in the United States and being told that British laws were considered more favorable, Mr. van Zonneveld left.

During the interview, the position of Mr. Wilkinson was one of insistence that the plaintiff was shipping under the Harris & Dixon contract products made from crude oil owned by Mexican Eagle; that such cargoes would be seized; that Harris & Dixon ought not to be a party to such business; but that the latter could not expect to be indemnified if it defaulted on its contract and was left to do as it thought best in view of the attitude of the Shell Group and the British Government.

The next interview Mr. van Zonneveld had with one who spoke for the defendants was in New York on November 24th. It

was with Mr. Boyle who was the head of the legal department of the Shell Group in London. Mr. van Zonneveld then went to the office of the Mexican Eagle to tell Mr. Wilkinson "that we were just going ahead, that we had decided to open up credits and take the cargo". As Mr. Wilkinson was away he saw Mr. Boyle instead. He had in the meanwhile consulted again with Mr. Leach; with representatives of the plaintiff; and had communicated with his own firm in London. As that was the first time Mr. van Zonneveld had seen Mr. Boyle, he explained the situation fully to him and expressed concern about the possibility of the seizure of cargoes and asked if there was any way to protect Harris & Dixon "because they really had nothing to do. with the whole issue". Mr. Boyle said it certainly was unfortunate but that they would take no steps so far as Harris & Dixon were concerned. Then van Zonneveld urged Boyle to consider the innocent party position of Harris & Dixon who had made the contract before any Mexican trouble had arisen and asked him to look at the contract "and confirm to me that that is a legal binding contract signed by a British firm that has to be lived up to". At that he left a copy of the contract with Boyle upon the understanding that they would meet again the next day.

They did meet as agreed in the office of the Mexican Eagle and this time Mr. Wilkinson was present. Mr. van Zonneveld asked Mr. Boyle what he thought of the Harris & Dixon position under the contract and was told "that it was a contract we had to live up to, there might be one or two or three very meagre possibilities of our getting out of the contract and defaulting if he wanted to, but I think he admitted they were very, very weak". Mr. Boyle also then said he was "sorry he could not possibly give us any advice because it was not for him to make any suggestions, but if he were in our position the cheapest thing might be to default". The consequences of a default were discussed and, though no amount of damages was stated, Mr. van Zonneveld requested indemnity if his firm defaulted "but the answer was the same—certainly they could not or would not consider or even listen to that, that was our burden and we had to lose our own money". Mr. van Zonneveld was told either by Mr. Boyle or Mr. Wilkinson that the plaintiff was getting such a poor grade of crude oil from Mexico that it would sooner or later be unable to "produce the

gasoline as per our contract specifications". In the afternoon of the same day the three met again with a Mr. Houston, an attorney representing Harris & Dixon, Ltd., and the matter was discussed again to about the same effect with emphasis being placed by Mr. Boyle on "how unpleasant it must be for us to carry on a contract or do any business with us (sic) against the wishes of the British Government and that we certainly did not want to handle any material to which there was a stigma attached". Mr. Wilkinson also stated that "if the oil got in and even if there was no injunction we should not be able to sell it to our customers". Asked by Mr. van Zonneveld, "Is the Mexican Eagle going to do it?" Mr. Wilkinson replied, "No, not the Mexican Eagle but the British Government". Mr. Boyle also said, "that we certainly as a British firm would not like to incur the displeasure of the British Government or the enmity of the major oil companies", meaning those in Great Britain.

Following this interview Mr. van Zonneveld did not see representatives of the plaintiff again but talked with Mr. Leach, telling him and later notifying the plaintiff that Harris & Dixon, Ltd., "were going to live up to the contract". The only interruption of performance under the contract was a delay of a few days in loading the "Stigstad" and there has since been continued performance by Harris & Dixon, Ltd.

The plaintiff relied somewhat in the District Court upon a falling off of its business which was not, however, proved to have been the result of conduct of the defendants and was, we think rightly, disregarded. Also, a point was made of the refusal of the Asiatic Petroleum Corporation to make a new contract with the plaintiff but that was only an exercise of its right to decline to deal with the plaintiff if it should see fit to do so. Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448, 30 A.L.R. 1114. The same is true of the refusal of brokers to renew contracts or enter into new ones with the plaintiff. Likewise, what was done wholly abroad unaided by acts in this country must be counted out. American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047. And whatever has been shown to have been done in this country in aid of any combination abroad, see United States v. Sisal Sales

Corporation, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042, relates to the Harris & Dixon matter.

The real issue now is whether the claimed attempt to induce Harris & Dixon, Ltd., to break its contract with the plaintiff gives adequate support for the preliminary injunction. There can be no fair doubt but that the defendants wanted to stop the sale of crude oil claimed to belong to Mexican Eagle and consequently to stop the performance of that contract in so far as it was being performed by the shipment of products refined from such crude oil and, because they were convinced that performance through the use of any Mexican oil the plaintiff was getting from Distribuidora would of necessity be in part oil they claimed to belong to Mexican Eagle, they thought there could be no such performance without violating the rights of Mexican Eagle.

In the district court the defendants took the position, as they do here, that they need not prove that Distribuidora did not have a good title to the crude oil it sold the plaintiff in order to prevent the issuance of an injunction pendente lite and that it is enough to give them the privilege to do all they did to show that they believed in good faith that Mexican Eagle did own the oil despite the claims of Distribuidora under the Mexican decrees. The district judge misconceived the position of the defendants as to this in that he took it to amount to a concession for present purposes "that title to the oil was acquired by the Mexican Government and passed to the plaintiff, whether or not the oil is from confiscated property". On this assumption, there was no justifiable basis for any interference with the performance of the plaintiff's contract and the injunction was accordingly issued.

Rightly understood, however, the position the defendants have taken does leave them free to contest with great force the issuance of an injunction pendente lite. They are charged in the bill of complaint with unreasonable restraint of the foreign commerce of the plaintiff in violation of the anti-trust laws. That boils down to whether or not, within the purview of those laws, what was done in respect to the Harris & Dixon contract amounts to actual, or threatened, unreasonable restraint. That, in turn, comes down to whether or not the defendants, upon being asked what their attitude was concerning performance of that contract, and believing reasonably that it was being performed by means of products they claimed were made from crude oil belonging to Mexican Eagle, overstepped the bounds of their privilege to reply as they did.

We do not now undertake to decide whether or not the defendants can successfully maintain their claim that Mexican Eagle owned the oil taken from the expropriated wells it formerly did own. That may be left for decision after trial. It is plain that they did believe they could successfully seize products abroad when the opportunity presented itself whenever they could prove that those products were refined from crude oil which came from the expropriated Mexican Eagle wells. The Shell Group had secured a favorable decision in an action brought after seizure of such products in France and also in one of like nature in Holland which would give fair ground for such a belief. Thus it was sufficiently established that the defendants had reasonable cause to believe that in such jurisdictions at least seizures could be successfully made.

Having then the reasonable belief that they would be entitled to maintain their claim that Mexican Eagle owned such products whenever they could thus be seized, the defendants were by the inquiries made of them by Harris & Dixon, Ltd., placed where they might assert their claims. The alternative would have been a concession which might have been an estoppel had any of the products shipped under the contract later been seized. It should be remembered that defendants did not seek out Harris & Dixon to induce a breach of contract. On the contrary Harris & Dixon, clearly disturbed by a more or less general rumor, not traced in origin to the defendants, that their cargoes would be seized sought out the defendants as suggested by the British Ministry of Mines.

Had the defendants, in reply to such inquiries as Mr. van Zonneveld made, done no more than assert in good faith their claim that Mexican Eagle's crude oil was being used unlawfully by the plaintiff coupled with the assurance that whatever legal rights Mexican Eagle had by way of seizure would be enforced, there could be no doubt that they would have exercised only their privilege so to do. If what the defendants did amounted to actionable slander of the plaintiff's title to the products it was shipping and intended to ship

under the Harris & Dixon contract there was an unlawful interference with the contractual relations existing between the plaintiff and a third person by way of inducement to a breach. See Second Nat. Bank v. M. Samuel & Sons, 2 Cir., 12 F.2d 963, 53 A.L.R. 49. So decision upon this phase of the matter should depend upon whether or not there was an actionable slander of plaintiff's title. As to that the decisive factor is the reasonable belief of the defendants that Mexican Eagle had an interest in the products being shipped by the plaintiff which could be, and would be, supported by lawful seizure as occasions for that arose. An honest and reasonable belief to this effect would justify an expression of it even though the belief were a mistaken one. Hopkins v. Drowne, 21 R. I. 20, 41 A. 567. The privilege of one to make known his intent to assert legal rights he believes in good faith that he has in property, even though he may be mistaken, is well illustrated in patent cases. Warren Featherbone Co. v. Landauer, C.C., 151 F. 130; A. B. Farquhar Co. v. National Harrow Co., 3 Cir., 102 F. 714, 49 L.R.A. 755.

But further than this, the basis of the bill in this suit is wholly the claimed unreasonable restraint of the foreign commerce of the plaintiff. It is only the kind of restraint of such trade which is unreasonable that is forbidden by the anti-trust laws. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734. And to determine whether there is, or is threatened, an unreasonable restraint the particular conditions of each case must be considered with care in the light of the circumstances shown and effect be given to realities. Appalachian Coals, Inc., v. United States, 288 U.S. 344, 360, 53 S.Ct. 471, 77 L.Ed. 825.

In applying this principle to the present case, we find that Harris & Dixon, Ltd., was led by general report in London to believe that cargoes shipped to it by the plaintiff under its contract would be seized under the claim that they were made from confiscated crude oil owned by Mexican Eagle; that Harris & Dixon became aware that the British Government was unfriendly to the importation of such products as was the trade in general and that Harris & Dixon, at the suggestion of the British Ministry of Mines and the British authorities in this country, sought out the defendants for the purpose of being informed as to what Mexican Eagle intended to do in respect to its claim that Harris & Dixon was receiving under its contract products made from Mexican Eagle's crude oil and to obtain indemnity if it could in the event that it decided to default. Placed in this situation, it was not unreasonable for the defendants to state in good faith to the representative of Harris & Dixon just what the attitude of Mexican Eagle was and would be; leaving Harris & Dixon to decide without any expectation of indemnity what its conduct should be. Nor does the fact that there was some expression of what was known to be the attitude of the British Government and of the major oil companies toward traffic in confiscated oil justify an injunction pendente lite. There was no threat to do more than attempt to enforce legal rights thought in good faith to be possessed by Mexican Eagle. Pressed as they were to agree to indemnify Harris & Dixon and to advise that firm as to the course it should take, we do not find that the defendants brought about, or did anything which threatened to bring about, an unreasonable restraint of plaintiff's foreign trade in respect to the Harris & Dixon contract. On the contrary, the rather cautious replies made to inquiries show the intent to insist upon the claim that Mexican Eagle's crude oil was being unlawfully taken and used in the performance of the contract together with the assertion that legal steps would be taken whenever possible to prevent that; leaving Harris & Dixon, Ltd., to its own resources and the exercise of its own judgment in an admittedly difficult position which was primarily due to the fact that the plaintiff was buying crude oil that Mexican Eagle honestly claimed to own and was selling to Harris & Dixon, Ltd., products refined from that oil.

A majority of the court is of the opinion that when van Zonneveld came to this country to ascertain what attitude the defendants would adopt with respect to the contract between the plaintiff and Harris & Dixon, Ltd., Wilkinson, representing the other defendants, could inform him that attachments would be levied in foreign countries without assuming the duty of attaching the oil in this country. The privilege of the defendants to state their position regarding action abroad was not dependent upon the adoption of, and the attempt to, enforce the same position in this country. In other words, the defendants

were not bound, in order to make their good faith manifest, to follow up such information or threats, if they be regarded as such, by instituting suits promptly to try title in the courts of the United States. In saying this we do not imply that there would be no duty to begin suits promptly in our courts if there was no likelihood of an opportunity to sue in foreign courts within a reasonable time.

When such information was given in good faith to a representative of those who sought it in order to protect their own interests, it could be safely given. The only threats were of attachments in foreign countries. There seems to be no basis in the record for holding that these were not made in good faith or that the defendants failed to act promptly in pursuing the remedies they told Harris & Dixon, Ltd., they proposed to seek. The first threats of attachment traceable to the defendants occurred on November 4, 1938. The next shipment was not due to leave Texas until after November 25th. In fact the oil was not loaded until December 16, 1938, and would not reach England until January, 1939.

Moreover, there seems to be no proof of unreasonable delay even in our own courts. The last conversation between van Zonneveld and representatives of the defendants in New York was on November 25, 1938, and the plaintiff brought this suit on December 9, 1938. The defendants appear to have counter-claimed for the oil shortly after February 3, 1939. Even if it were necessary to bring suit in this country in support of the assertions that Mexican Eagle owned the oil and would seize abroad the products refined from it, the failure to sue for slightly more than two months ought not to be held an undue delay. And under Rule 41 the District Court has the power in its discretion to refuse to permit the defendants to dismiss the counterclaim for conversion if such action would be likely to prejudice the plaintiff's rights.

On the record now made we accordingly fail to find adequate support for an injunction pendente lite.

Order reversed and injunction pendente lite dissolved.

L. HAND, Circuit Judge (dissenting).

Upon an application like this all doubts must, of course, be taken against the plaintiff; but—quite aside from the contract with Harris & Dixon, Ld.—it is clear that the defendants are threatening its customers in a way that is damaging, and may be ruinous. They are doing this by challenging its title to the oil, which they declare generally they may attach as their own, if others buy it. This they assert a privilege to do, because they say that they honestly believe the oil to be theirs: that is, that the expropriation of it by the Mexican Government will not be recognized by the courts of other countries. I shall assume arguendo that a person is privileged to assert an honest claim of title to property in the possession of another, even to the extent of diverting his customers. Huxley v. Hayes, C. C., 191 F. 943, affirmed 3 Cir., 201 F. 899; Restatement of Torts, § 647. It seems to me strange that such a privilege should exist, if the claim be unwarranted, and I should try to reach an opposite conclusion, if the point were necessary to decide. It is not. The putative privilege must in any event be ancillary to the protection of the claimant's own title; it is accorded him only in order to prevent dispersion of the property before he can secure an adjudication. Certainly I can see no other legitimate interest he can have, which justifies the damage inflicted. If so, obviously the claimant may not avail himself of it, and yet refuse to resort to courts able and competent to judge the dispute. This is well brought out in those cases which enjoin a patentee who will not sue on his patent, from badgering the trade by threats he refuses to push home. Adriance, Platt & Co. v. National Harrow Co., 2 Cir., 121 F. 827; Virtue v. Creamery P. M. Co., 8 Cir., 179 F. 115; Oil Conservation Eng. Co. v. Brooks Eng. Co., 6 Cir., 52 F.2d 783; Art Metal Works v. Abraham &- Straus, 2 Cir., 62 F.2d 79; American Ball Co. v. Federal Cartridge Corp., 8 Cir., 70 F.2d 579, 98 A.L.R. 665. It is often said in these cases that the privilege depends upon the honesty of the claim, and that the refusal to sue is merely evidence of bad faith; and that may not be practically objectionable. But it veils the proper theory, for a man might honestly believe in his title and yet refuse to assert it, in which event his privilege would certainly not survive.

I am not clear that my brothers disagree with the statement of law I have just made: in any case, as I understand it, they rely, at least in part, upon the fact that the defendants have filed a counterclaim in

this suit alleging a conversion of the oil. That was after the order had been entered, and we cannot consider it on this appeal; and as the record stands, the defendants have refused to test their title in our courts. That, to my mind (full opportunity to do so having existed for many months), tolled their privilege to divert the plaintiff's customers. I do not of course mean that the courts of other countries are not as competent as our own, but it seems to me axiomatic that we should not excuse what would otherwise be a wrong upon the assumption that the putative wrongdoer cannot obtain justice here. I would therefore affirm the order, with leave, however, to the defendants to move in the district court to vacate the injunction because of the pendency of the counterclaim.

So far I have been speaking only of diverting prospective customers, not of inducing buyers to break their contracts. As my views are not to prevail, it hardly seems worth while to go into that difference here; except to notice it, and to say that in my judgment the privilege to induce a breach is, and should be, much narrower than to divert customers, who are still fair game for both competitors. I doubt that an honest, but unwarranted, belief in the validity of one's title will excuse such an injury; but I must own that I know of no authority on the question.