CONSOLIDATED ALUMINUM
CORPORATION

v.

BANK OF VIRGINIA and Graf-Comm,
Inc.

Civ. No. K–80–1771.

United States District Court,
D. Maryland.

June 29, 1982.

David F. Albright, Richard M. Kremén, William L. Hallam and Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff.

Donald E. Sharpe and Karen L. Myers Zauner, Baltimore, Md., for defendant, Bank of Virginia.

Defendant Graf-Comm, Inc., unrepresented.

FRANK A. KAUFMAN, Chief Judge.

[1] This case[1] presents the issue of whether or not presentment of a draft after the expiration date of a letter of credit may be excused because of delay in the mails.[2] Plaintiff Consolidated Aluminum Corp. (Consolidated), relying on § 3–511(1)[3] of

1. Plaintiff Consolidated Aluminum Corp. (Consolidated) is a New York corporation with its principal place of business in Missouri. The defendant Bank of Virginia (Bank) is a Virginia corporation with its principal place of business in Virginia. Defendant Graf-Comm, Inc. is a Maryland corporation with its principal place of business in Maryland. The amount in controversy, exclusive of interest and costs, exceeds $10,000. Accordingly, diversity jurisdiction is present.

On July 9, 1980, Consolidated instituted the within action (a) against the Bank for repudiation of the letter of credit and (b) against Graf-Comm for the amount due for goods sold and delivered. Graf-Comm, after being appropriately served in this case, did not enter an appearance or defend in any way. Accordingly, final judgment by default was entered against Graf-Comm on January 16, 1981.

Consolidated and the Bank originally filed cross-motions for summary judgment. Those motions were denied during a hearing held in open Court, at which time this Court invited the parties to submit additional affidavits and memoranda addressed to the reasonableness of Consolidated's use of the mails. In addition, the parties indicated their desire to engage in additional discovery. Thereafter, the parties submitted additional affidavits and memoranda and took and filed two depositions. This Court then held a further hearing at which time the parties stated their willingness to have this Court decide the issues presented by this case on the basis of the documentary record after the parties had had the opportunity to supplement the record with further affidavits and memoranda. The record in this case has now been so supplemented and the parties have further stated that they do not desire to present any live or additional evidence or to present further argument to this Court. Accordingly, the within case is ripe for decision on the record as presented.

2. Put another way, the question presented is whether or not the risk of delay in the mails must, in the absence of any agreement to the contrary, be borne by (a) the beneficiary of a letter of credit or (b) the issuing bank.

3. That section provides:

Delay in presentment, protest or notice of dishonor is excused when the party is without notice that it is due or when the delay is caused by circumstances beyond his control and he exercises reasonable diligence after the cause of the delay ceases to operate.

the Uniform Commercial Code (UCC), maintains that such delay does excuse untimely presentment.[4] Defendant Bank of Virginia (Bank), relying on the general commercial law applicable to letters of credit and on the Uniform Customs and Practices for Documentary Credits (1974 Revision), International Chamber of Commerce Publication 290 (Uniform Customs),[5] takes the opposite position.

Consolidated was the beneficiary of an irrevocable letter of credit[6] in the amount of $35,000 issued by the Bank on March 12, 1979, at the request of Graf-Comm, Inc., one of Consolidated's customers. The original expiration date of the letter of credit required presentment at the Bank's counters on or before June 29, 1979. That original expiration date was subsequently extended by the Bank on four occasions, the last extension being until April 7, 1980. The letter of credit provided that payment would be made to Consolidated on sight of a document stating that merchandise had been shipped to Graf-Comm on a specified date and that Graf-Comm had not effected payment therefor to Consolidated on demand. The letter of credit stated "that drafts drawn and negotiated in conformity with the terms of this credit will be duly honored on presentation." The letter of credit further provided that payment by the Bank would relieve Graf-Comm of any obligation to pay for any merchandise described by Consolidated in any document accompanying a sight draft submitted by Consolidated to the Bank. Finally, the letter of credit provided (as, seemingly, do nearly all letters of credit[7]) that "[e]xcept as otherwise expressly stated, this documentary

---

The above provision is part of Article 3 of the Uniform Commercial Code (UCC) entitled "Commercial Paper." The Official Comment to § 3–101 states, in part: "This Article represents a complete revision and modernization of the Uniform Negotiable Instruments Law." Letters of credit are dealt with in the UCC in Article 5. For possible differences between negotiable instruments and letters of credit, and among types of letters of credit, see the discussion *infra*.

4. Subject-matter jurisdiction in this case is based upon diversity of citizenship. *See* note 1 *supra*. Therefore, the conflict of laws rules of the forum state, *i.e.*, Maryland, govern herein. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Chesapeake v. Allegheny Constr. Co.*, 340 F.Supp. 734, 739 (D.Md.1972). In this case, Maryland conflicts law calls for the application of the substantive law of Virginia. *See Keco Indus., Inc. v. ACF Indus., Inc.*, 316 F.2d 513, 514 (4th Cir. 1963) (applying Maryland law) in which Judge Boreman wrote:

The law of the place of contracting governs matters bearing upon the execution, interpretation and validity of the contract but matters arising in connection with performance of the contract are governed by the place of performance, the place where the contract by its terms is to be performed.

The letter of credit in this case required that the draft and documents be presented "at the counters" of the Bank of Virginia in Richmond, Virginia. Therefore, Virginia is the place of performance, and to the extent that the parties have not expressly agreed otherwise, as, for example, with regard to the Uniform Customs discussed *infra* in note 5, the law of Virginia

governs the resolution of the issues presented in this case.

Virginia has adopted in their entirety all provisions of the UCC relevant herein. Va.Code §§ 8.1–101 to 8.11–108. Accordingly, specific reference to the Code of Virginia will not be made in this opinion; rather, the applicable statute will be cited only as the UCC. Furthermore, because the general commercial law governing the instant case does not appear to vary among jurisdictions and because there is no Virginia case on point, specific reference to Virginia law will not be made.

5. The Uniform Customs do not have the force of law, but are only applicable where, as they have done in this case, the parties have expressly made the letter of credit subject to the Uniform Customs. In addition, the Uniform Customs are important as evidence of prevailing custom with regard to letters of credit. *See* H. Harfield, Letters of Credit 3–4 (1979).

6. Letters of credit may be revocable or irrevocable. *See* UCC § 5–103(1)(a); Uniform Customs Art. 1(a). Because "[a] revocable credit may be amended or cancelled at any moment without prior notice to the beneficiary," Uniform Customs Art. 2; *see also* UCC § 5–106(3) (to substantially the same effect), revocable letters of credit do not represent the binding, unconditional obligation of the issuing bank. Revocable credits thus present very different considerations than do irrevocable credits. In this opinion the terms "letter of credit" and "credit" are used in reference only to an irrevocable letter of credit.

7. *See* H. Harfield, note 5 *supra*, at 3.

credit is subject to the Uniform Customs and Practices for Documentary Credits (1974 Revision) International Chamber of Commerce (Brochure No. 290)."

During the month of February 1980, Consolidated shipped to Graf-Comm $34,762.41 worth of merchandise which had been ordered by Graf-Comm over a period of several months prior to those shipments. Consolidated duly invoiced Graf-Comm for the same, but Graf-Comm did not pay (and apparently has not paid to date) for that merchandise.

On March 24, 1980, Armand U. Simeone, Consolidated's credit manager, contacted Gregory S. Sandvig of the Bank in order to obtain a further extension of the expiration date of the letter of credit beyond April 7, 1980. According to Simeone, Sandvig indicated that the Bank had not yet decided whether to grant an additional extension beyond April 7, 1980. However, Simeone testified on deposition that at that earlier time he (Simeone) felt that the Bank might decide not so to do and might conclude to terminate its (the Bank's) relationship with Graf-Comm. On April 2, 1980, Sandvig told Simeone that the Bank still had not determined whether to extend the expiration date beyond April 7, 1980, and advised Simeone that Consolidated should do whatever was necessary in order to protect Consolidated's interests. Simeone responded that he would prepare a draft. Accordingly, immediately after that April 2, 1980 conversation, Simeone wrote a letter to Sandvig setting forth the information required for payment under the letter of credit and enclosing a sight draft in the amount of $34,762.41, dated April 2, 1980, and invoices reflecting delivery to Graf-Comm of merchandise totaling that amount. All of those documents were sent to the Bank from Consolidated's offices on April 2, 1980, in accordance with Consolidated's usual practices, by certified mail.

The draft and attached documents were received in the mail by the Bank on April 11, 1980, nine days after they were mailed and four days after the April 7th expiration date. On April 15, 1980, after learning that other pieces of mail sent from Consolidated's offices on April 2, 1980, had been delayed, Simeone contacted the Bank and was told that the draft had not been received until April 11, 1980, and that the Bank could pay the draft only if Graf-Comm consented.[8] Thereafter, the Presi-

---

**8.** As a practical matter in the particular instance or as a matter of bank policy, the Bank may not have been willing to pay an untimely draft without Graf-Comm's consent. However, the Bank's position that, as a matter of law, it could not pay was seemingly not correct. A letter of credit is a contract only between the issuer and the beneficiary and is thus independent of the contract between the issuing bank and its customer. Accordingly, the issuing bank may waive timely presentment without the consent of its customer, although such waiver may affect the issuing bank's right to reimbursement from its customer. *See Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 886–87 (3d Cir. 1977). In addition, in certain circumstances, a bank may be estopped from asserting noncompliance as an excuse for dishonor when its conduct has induced the beneficiary detrimentally to rely on the fact that such noncompliance would not affect the bank's obligation under the credit. *See, e.g., U. S. Indus. v. Second New Haven Bank*, 462 F.Supp. 662, 666 (D.Conn.1978). In this case, however, there is nothing in the record to support a finding of waiver or of estoppel. In fact, there is evidence to the contrary. On April 2, 1980, five days before the expiration of the credit,

Simeone spoke to Sandvig about the prospect for a further extension of the letter of credit and Sandvig told Simeone to protect himself. Thereupon, Simeone responded that he would prepare a draft. According to Sandvig, this conversation may have occurred as early as March 24, 1980. However, even if such conversation did not occur until April 2, 1980, as Simeone testified at his deposition, Consolidated still had ample time at that point to present the draft to the Bank. Furthermore, in conversations with Simeone prior to April 2, 1980, Sandvig had been at best noncommittal about a further extension and Simeone was aware that the Bank was seriously considering terminating its relationship with Graf-Comm. Thus, Consolidated seemingly cannot claim that it reasonably expected a further extension of the letter of credit. However, even if Consolidated reasonably expected a further extension of the letter of credit prior to April 2, 1980, that expectation was no longer reasonable after Sandvig told Simeone to protect himself, no later than April 2, 1980, at which time Consolidated had sufficient time to forward the draft. Furthermore, the Bank's noncommital stance with regard to a further extension of the letter of

dent of Graf-Comm orally instructed the Bank not to pay the draft, the Bank refused to pay the draft, and the Bank returned the draft and accompanying documents to Consolidated on April 17, 1980.

Employees of Consolidated do not personally place their correspondence in the United States mails. Instead, postage is affixed to correspondence by a postage meter operated by personnel of Consolidated and the correspondence is then placed in a private locked box. Consolidated utilizes a private locked box service company to pick up and carry Consolidated's mail to the post office. It appears that all correspondence which that private locked box service company picked up from Consolidated was delivered by it to the United States Postal Service on April 2, 1980. However, it also appears that mail addressed by Consolidated to addressees other than the Bank and placed on April 2, 1980, by Consolidated in the private locked box was not received by those other addressees for nearly two weeks. That delay was apparently not caused by either Consolidated or by the private locked box service company. If the latter had been at fault, seemingly Consolidated's position vis-a-vis the Bank would be the same as if Consolidated itself had been at fault. But in this case, the fault must be attributed to the Postal Service. Furthermore, Consolidated's use of the mails was seemingly reasonably diligent. In the ordinary course of

mail delivery by the Postal Service, the draft and accompanying documents should have reached the Bank on or before the expiration date.[9] Indeed, the probability was about ninety-five percent that a certified letter mailed from St. Louis, Missouri, on April 2, 1980, would have reached Richmond, Virginia, within three days.[10] Additionally, there was nearly a ninety-nine percent probability that such a letter would have reached Richmond within five days.[11] Moreover, the fact that April 4, 1980, was Good Friday, and April 6, 1980, was Easter Sunday, would seemingly have had no effect on the anticipated delivery time of such a letter.[12]

Nothing in the record demonstrates that Consolidated's use of certified mail was unreasonable in the light of any custom in the industry or course of dealing between the parties. Sandvig testified during the taking of his deposition that in his experience drafts under letters of credit were generally presented by registered mail, albeit well in advance of the expiration date.[13] Furthermore, Consolidated had previously sent a draft under the instant letter of credit by certified mail on December 4, 1979, three days before the credit's then expiration date of December 7, 1979, and the draft had reached the Bank on that expiration date. (That draft was not paid by the Bank, however since the December 7, 1979, expira-

---

credit did not prevent Consolidated from forwarding the draft prior to April 2, 1980. Finally, the conversations between Simeone and Sandvig certainly formed no basis for any belief on Simeone's part that, in the absence of a further extension of the expiration date, the Bank would waive timely presentment. In fact, Simeone testified at his deposition that he was aware that the expiration date was a very critical term of a letter of credit.

9. *See* Affidavits of Thomas J. Oswald, Acting Director of Customer Service for the United States Postal Service Management Sectional Center, Baltimore, Maryland (Doc. 13), Thomas J. Douglas, Logistics Coordinator for the United States Postal Service, St. Louis, Missouri, (Docs. 30 and 34) and Charles E. Dillon, Acting S/C Director, Mail Processing, United States Postal Service, Richmond, Virginia, (Doc. 30).

10. *See* Affidavits of Thomas J. Oswald (Doc. 13) and Thomas J. Douglas (Doc. 34); Letter of

Carolynne M. Seeman, Manager, Administrative Statistics Branch, Statistical Operations Division, Rates and Classification Branch, United States Postal Service, Washington, D. C., to William Hallam, dated November 12, 1981, (Doc. 34).

11. *See* Letter of Carolynne M. Seeman to William Hallam, dated November 12, 1981 (Doc. 34).

12. *See* Affidavit of Thomas J. Douglas (Doc. 34) and Carl T. Lawhorne, Manager of Distribution, United States Postal Service, Richmond, Virginia (Doc. 37); Letter of Carolynne M. Seeman to William Hallam, dated November 12, 1981.

13. *See* Deposition of Gregory S. Sandvig at 71 (Doc. 29).

tion date was subsequently extended by agreement among all parties.) [14]

While in the light of the standard of strict compliance generally applicable to letter of credit transactions and the availability of overnight delivery services by both the Postal Service and private carriers, the use of certified but still regular mail five days before the expiration date of the letter of credit might arguably be said to be close to the borderline of reasonable diligence, particularly in view of Consolidated's awareness that the expiration date of the letter of credit was a critical term,[15] and while it might also be argued that the more prudent course of action for Consolidated to have taken would have been to have utilized an overnight delivery service and to have checked with the Bank to ascertain whether or not timely delivery had been effectuated, nevertheless, on balance, Consolidated appears to have acted with reasonable diligence. Accordingly, the within controversy is approached in that factual context.

Consolidated contends that UCC § 3–511(1), and prior law which underlies it, excuses Consolidated's late presentment of the draft because Consolidated acted with reasonable diligence and because the delay in the mails was beyond its control. Official Comment 2 to § 3–511 explains:

> Subsection (1) combines provisions found in the original Sections 81, 113, 147 and 159 [of the Negotiable Instruments Law]. Delay in making presentment either for payment or for acceptance, in giving notice of dishonor or in making protest is excused when the party has acted with reasonable diligence and the delay is not his fault. This is true where an instrument has been accelerated without his knowledge, or demand has been made by a prior holder immediately before his purchase. It is true under any other circumstances where the delay is beyond his control. The words "not imputable to his default, misconduct or negligence" found in the original Sections 81,

113 and 159 are omitted as superfluous, but no change in substance is intended.

A leading treatise writer on the UCC has written with regard to § 3–511(1):

> The late presentation of an instrument is excused where the delay is the result of an unforseeable delay in the postal service. Thus, if an item is mailed in time so that ordinarily it would reach the destination point on a proper day, the sender is excused when because of some fault or mistake on the part of the postal system the item is not delivered until a later date.

3 W. Anderson, Uniform Commercial Code § 3–511:12, at 76 (3d ed. 1971) (footnote omitted).

In *The Windham Bank v. Norton, Converse & Co.*, 22 Conn. 213 (1852), plaintiff, the holder of a bill of exchange which had been endorsed to plaintiff by defendant, forwarded the bill to a bank in New York City in ample time for timely presentment to the bank in Philadelphia at which the bill was to be presented by June 2, 1849. The bill was delivered by the New York bank to the United States Post Office in New York City on June 1, 1849, in time for departure in the 4:30 p. m. mail out of New York. Under normal circumstances, that mail was due to arrive in Philadelphia at 9:30 p. m. on June 1. However, the Philadelphia mail was placed in mailbags in New York inadvertently marked for forwarding to Washington. Accordingly, on arrival on time in Philadelphia, they were carried to Washington and not returned to Philadelphia and there delivered until some days later. Upon an action by plaintiff for the amount of the bill, the defendant contended (*id.* at 218–19) that it had been discharged by the untimely presentment of the bill to the Philadelphia bank. The Supreme Court of Errors of Connecticut rejected defendant's argument, stating that "[t]he general principle . . . is, that reasonable diligence in the presentment of a bill for payment, is required of the holder, and that, therefore, if

---

**14.** *See* Second Affidavit of A. U. Simeone (Doc. 17).

**15.** *See* Deposition of Armand U. Simeone at 9 (Doc. 28).

there has been no want of such diligence, he is excused." *Id.* at 220. The Court found no lack of diligence on the part of plaintiff or its "agent," *id.* at 219, *i.e.*, the New York bank, and elaborated as follows:

In applying this principle, the general rule is, that it must be presented for payment, on the very day on which, by law, it becomes due, and that, unless the presentment be so made, it is a fatal objection to any right of recovery against the indorser. But, although this is the general rule, it is not an universal one, and prevails only under the qualification, which is really a part of the rule itself, that there is no negligence or want of reasonable diligence, in not making such presentment. The whole rule, therefore, more properly stated, is, that the presentment must be on the day on which the bill becomes due, unless it is not in the power of the holder, by the use of reasonable diligence, so to present it.

*Id.* at 220. The Court also wrote:

And it is clear, that the strict rule of the common law, by which an inability to perform the terms or condition of a contract, by reason of inevitable accident or casualty, constitutes generally no excuse for their non-performance, is not applicable to mercantile instruments of this description. Therefore, the excuse for non-presentment in this case, presents the ordinary question of negligence.

*Id.* at 221. Although cautioning that "no absolute or positive rule can . . . be laid down, which shall apply under all circumstances," the court stated that "it is considered a well settled rule, that such want of presentment is excused, by any inevitable or unavoidable accident not attributable to the fault of the holder, provided there is presentment by him, as soon afterward as he is able." *Id.*

In *Second National Bank of Toledo v. M. Samuel & Sons*, 12 F.2d 963 (2d Cir.), *cert. denied*, 273 U.S. 720, 47 S.Ct. 110, 71 L.Ed. 857 (1926), Irving National Bank (Irving) issued, at the request of defendant, an irrevocable letter of credit to the United States War Department in an amount equal to ninety percent of defendant's bid for the purchase of scrap metal from that Department. The letter of credit provided that drafts presented by the Department in amounts not exceeding a specified amount and accompanied by an invoice covering the scrap metal in question would be paid at sight. The letter of credit was originally set to expire on January 17, 1923, but the expiration date was subsequently extended by Irving at defendant's direction, to and including February 1, 1923. On January 31, 1923, the Department presented to plaintiff Second National Bank of Toledo a draft drawn on Irving in accordance with the terms of the letter of credit, which plaintiff purchased for the face amount thereof. On that same day, plaintiff placed in the mail in Toledo, Ohio, the draft, addressed to Irving. Ordinarily, mail deposited in the post office in Toledo by the afternoon of one day was due to arrive in New York on the morning of the following day and was customarily delivered to a bank-addressee such as Irving and paid during the afternoon of that same day. However, the draft mailed by plaintiff on January 31 did not reach Irving until February 2, one day after the letter of credit expired. Irving, at defendant's direction, refused to honor the draft because of late presentment. Thereupon, plaintiff bank sued defendant in equity "to compel the defendant to surrender to [plaintiff] the merchandise covered by the invoice accompanying the draft . . . or . . . to account to the plaintiff for the proceeds of the sale." *Id.* at 964–65.

The Second Circuit stated that "[t]he question which this state of facts raises is whether this unexpected and unforeseen delay in the transmission of the draft by mail, and which was not occasioned by the plaintiff's negligence, and for which it was in no way responsible, excuses the failure to make presentment of the draft on February 1st." *Id.* at 965. Relying, *inter alia*, on *The Windham Bank* and also on the Negotiable Instruments Law, the Second Circuit held that "[t]he delay in making presentment in this case was caused by circumstances beyond the control of the plaintiff, and was not imputable to its default, misconduct, or

negligence, and was therefore excusable." *Id.* at 966.[16]

The Second Circuit ultimately held that plaintiff had a remedy against defendant, but not in equity. Rather, the court held that the plaintiff might sue defendant at law for wrongfully inducing the issuer of the credit, *i.e.*, Irving, to breach the letter of credit contract. Accordingly, the court remanded the case to the district court with directions to transfer it to the law side of the court. *Id.* at 967–68.

In *Second National Bank of Toledo*, the sole defendant was the customer of the issuing bank, *i.e.*, the purchaser of the scrap metal, not Irving. The Second Circuit commented specifically that "[t]he plaintiff has not seen fit to sue the Irving National Bank at law, which it might have done." *Id.* at 967. The Second Circuit thus rather clearly implied that the plaintiff would have prevailed in such an action, despite plaintiff's failure to make presentment within the time period provided in the credit instrument itself.

The standard of reasonable diligence embodied in UCC § 3–511(1) is a rule applicable to, among other things, the presentment of negotiable instruments. While a draft drawn under a letter of credit *can* be a negotiable instrument, *see* UCC §§ 3–104 & 3–105(1)(d),[17] a letter of credit seemingly is not in and of itself a negotiable instrument.[18] In *Second National Bank of Toledo*, the Second Circuit stated: "A letter of credit is a letter whereby one person requests some other person to advance money or give credit to a third person, and promises to repay the same to the person making the advancement. It partakes of the nature of a negotiable instrument." 12 F.2d at 966.[19] The Second Circuit applied the reasonable diligence standard to the letter of credit at issue in that case. That credit was a commercial or documentary letter of credit. The letter of credit involved in the within case is a standby or guaranty letter of credit. While those two types of letters of credit are facially similar and are generally governed by the same legal principles,[20] they typically serve different purposes. The commercial letter of credit functions as

16. For other pre-1926 cases holding that late presentment of a negotiable instrument is excused where the holder has exercised reasonable diligence and the delay is caused by the mails, *see, e.g., Pier v. Heinrichshoffen*, 67 Mo. 163 (1877); *Newbold v. Boraff*, 155 Pa. 227, 26 A. 305 (1893); *Walsh v. Blatchley*, 6 Wis. 422 (1857). *See also Walsh v. Dart*, 23 Wis. 334 (1868). *Cf. Bradford v. Sturman*, 86 Idaho 178, 384 P.2d 64 (1963), in which the assignee of a promissory note who attempted to call the maker for several days by telephone before the maker finally came to the assignee's home and refused the assignee's request for payment was held excused with regard to the delay in making a late presentment due to the fact that the assignee was unable to find the maker until after the due date. That case, decided after 1926, does not involve use of the mails or a letter of credit. Neither this Court nor counsel for either party have discovered, since the *Second National Bank of Toledo* case was decided in 1926, any reported case which has excused due to delay in the mails the late presentment of a draft drawn pursuant to a letter of credit.

17. The draft sent to the Bank by Consolidated was seemingly a negotiable instrument. *See* UCC § 3–104. It was signed by the drawer (Consolidated). *See* UCC § 1–201(39). It con-

tained an unconditional order to pay, *see* UCC §§ 3–102(1)(b), 3–105, a sum certain in money ($34,762.41). *See* UCC § 3–106. It was payable at a definite time (on sight). *See* UCC § 3–109(1)(b). Finally, it was payable to the order of the drawer (Consolidated). *See* UCC § 3–110(1)(a). In addition, the letter of credit itself did not restrict the negotiability of drafts drawn thereunder. The credit provided that the Bank "engage[d] with drawers and/or bonafide holders that drafts drawn and negotiated in conformity with the terms of this credit will be duly honored on presentation."

18. *See United Technologies Corp. v. Citibank, N.A.*, 469 F.Supp. 473, 478 (S.D.N.Y.1979); *Shaffer v. Brooklyn Garden Apartments*, 20 U.C.C.Rep.Serv. 1269, 1275 (Minn.1977); H. Harfield, note 5 *supra*, at 2, 20, 79, 96.

19. *See also* 50 Am.Jur.2d *Letters of Credit, and Credit Cards* § 6, at 403–04 (1970) (listing cases).

20. *See* H. Harfield, note 5 *supra*, at 48; International Chamber of Commerce, Decisions (1975–1979) of the ICC Banking Commission 11 (Publication No. 371, 1980). *But see* Verkuil, *Bank Solvency and Guaranty Letters of Credit*, 25 Stan.L.Rev. 716, 725 (1973).

a mechanism of payment which facilitates a transaction involving the sale of tangible goods. The credit of the issuing bank is substituted for the credit of the buyer in order to induce the seller to enter into the transaction. The issuing bank typically pays against presentment of a draft accompanied by invoices, documents of title and insurance policies covering the goods.[21] When the draft presented is accompanied by documents of title, control of the goods through possession of the documents of title gives the issuer built-in security against default by its customer (*i.e.*, the buyer of the goods) on the customer's obligation to reimburse the issuer.[22]

The standby letter of credit, however, functions somewhat in the manner of a guaranty or a surety bond,[23] and thus is utilized to guarantee the performance of a wide variety of obligations.[24] Such letters of credit are usually issued at the request of the issuer's customer in return for the payment of a fee.[25] Even though the issuer is primarily liable,[26] the issuer of a standby letter expects to be called upon to make payment only if its customer defaults on the obligation secured by the credit.[27] Thus, whereas the issuer of a commercial letter of credit fully expects to be presented with a demand for payment and to pay in the normal course of events, the issuer of a standby letter of credit does not expect in the normal course of events that its customer will default on the underlying obligation and that it will have to pay out on the credit.[28]

 There is also a difference between any letter of credit and a draft drawn pursuant to it. Such a draft can be, as dis-

---

**21.** *See generally* E. Farnsworth & J. Honnold, Cases & Materials on Commercial Law 415–43 (3d ed. 1976).

**22.** *See* Verkuil, note 20 *supra*, at 721; H. Harfield, Bank Credits & Acceptances 56–57 (5th ed. 1974).

**23.** Unlike a guaranty or surety bond, however, on which the guarantor or surety is only secondarily liable if the primary promisor defaults, a standby letter of credit represents the primary obligation of the issuing bank.

It is important to note, that despite their similarities, the standby letter of credit is not a guarantee. Recovery under a guarantee is predicated upon the primary obligor's nonperformance *in fact* of its guaranteed obligations. The guarantor is therefore only *secondarily* liable with respect to the *same* obligation of the primary obligor. Recovery under a standby letter of credit, on the other hand, requires only the presentation of the requisite documents (*whether or not* the applicant [*i.e.*, the issuing bank's customer] has in fact performed, or even may legally perform, its obligations under the underlying agreement), and the issuer is *primarily* liable with respect to its obligations under the letter of credit (which obligations, needless to say, are different from those of the applicant under the underlying agreement).

Arnold & Bransilver, *Standby Letters of Credit—The Controversy Continues*, 10 U.C.C.L.J. 276, 279–80 (1978) (footnote omitted). Thus, although banks generally may not lawfully issue guaranties or surety bonds, they may, on the basis of the above-described distinction, issue standby letters of credit. *Id.*

**24.** For some examples of the diversity of obligations which may underlie standby letters of credit, see Arnold & Bransilver, note 23 *supra*, at 278; Verkuil, note 20 *supra*, at 721–22.

**25.** *See* Verkuil, note 20 *supra*, at 721 n.29.

**26.** *See* note 23 *supra*.

**27.** Payment under a standby letter of credit is typically made against presentment of a draft and a certificate that the issuer's customer has defaulted on the obligation underlying the standby credit. *See, e.g., Insurance Co. of North America v. Heritage Bank*, 595 F.2d 171, 172 (3d Cir. 1979); *Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 884 (3d Cir. 1977); *American Empire Ins. Co. v. Hanover Nat'l Bank*, 409 F.Supp. 459, 461 (M.D.Pa.1976); Arnold & Bransilver, note 23 *supra*, at 279 & n.26. Accordingly, unlike the issuer of a commercial letter of credit, the bank paying under a standby letter of credit generally receives nothing of value, *i.e.*, no documents of title to goods, at the time of, and in return for, its payment. Standby letters of credit thus may practically present different risks for the issuing bank than do commercial letters of credits. *See* Verkuil, note 20 *supra*, at 722–24.

**28.** *See* Arnold & Bransilver, note 23 *supra*, at 277–79. *See also* Verkuil, note 20 *supra*, at 725: "The bank is, in essence, secondarily liable, a conceptual distinction that separates the guaranty letter of credit from traditional letters of credit and might justify the application of different rules of law."

cussed *supra*, a negotiable instrument. Nevertheless, the obligation of the issuer of the letter of credit to pay such a draft is determined solely by reference to the four corners of the letter of credit. "The obligation of the drawee bank was graven in the credit. Indeed, there could be no departure from its words." *Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802, 806 (4th Cir. 1975).[29] Furthermore, a letter of credit contract imposes obligations not only upon the issuing bank but also upon the beneficiary and the bank's obligations are conditioned upon due performance by the beneficiary of its obligations.

The distinction between a letter of credit and a negotiable instrument is important. Unlike a negotiable instrument, a letter of credit does not convey a unilateral obligation; it is an executory contract that conditions performance of the issuer's obligation (payment) upon performance by the beneficiary (delivery of specified documents). Nonpayment by the issuer gives rise to an action by the beneficiary for breach of contract in which the beneficiary must plead and prove due performance on his part. The issuer may defend such an action by showing that the beneficiary failed to perform the letter of credit contract; breach of some other contract is no defense.

H. Harfield, Letters of Credit 79 (1979) (footnotes omitted). The issuing bank may insist that the beneficiary strictly comply with the terms and conditions of the letter of credit contract and the beneficiary's failure so to comply will excuse the issuer from liability on the credit. "[T]he beneficiary must meet the terms of the credit—and precisely—if it is to exact performance of the issuer. Failing such compliance there can be no recovery from the drawee." *Courtaulds North America, Inc. v. North*

*Carolina National Bank*, 528 F.2d at 805–06.[30]

The rule of strict compliance follows from the limited nature of the issuing bank's undertaking with regard to an irrevocable letter of credit and the allocation of risk—two intertwined factors. Uniform Customs Art. 3 provides that "[a]n irrevocable credit constitutes a definite undertaking of the issuing bank, provided that the terms and conditions of the credit are complied with . . . to pay . . . whether against a draft or not." A letter of credit is independent of any other contract, either a contract between the credit's beneficiary and the issuer's customer or a contract between the issuer and its customer. An irrevocable credit thus confers upon the beneficiary the unqualified right to demand payment provided that it strictly complies with the terms and conditions of the credit. That means that an irrevocable letter of credit constitutes the issuing bank's absolute, unconditional obligation to pay upon such compliance by the beneficiary. The issuing bank must determine whether or not the beneficiary has strictly complied with the terms and conditions of the credit on the basis of the documents alone. Uniform Customs Art. 8. The issuing bank's sole obligation is to determine whether or not the documents presented appear on their face to comply with the terms and conditions of the credit, and "its responsibility in this regard is entirely ministerial." *Insurance Company of North America v. Heritage Bank*, 595 F.2d 171, 173 (3d Cir. 1979).[31] Thus, the bank need not exercise any discretion in determining whether or not there has been compliance with the terms and conditions of a letter of credit. Substantial compliance will not suffice; there must be strict compliance with the terms and conditions of the letter of credit or the issuing bank is relieved of the obligation to pay thereunder.

---

29. "An issuer's liability on a letter of credit is controlled-solely by the terms of that letter." *East Girard Sav. Ass'n v. Citizens Nat'l Bank & Trust Co.*, 593 F.2d 598, 602 (5th Cir. 1979).

30. *See* H. Harfield, Bank Credits & Acceptances 73 (5th ed. 1974) (and cases listed thereat).

31. . *See Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 885 (3d Cir. 1977).

The rule of strict compliance and the ministerial nature of the issuing bank's responsibility to determine whether or not documents presented by the beneficiary conform to the terms and conditions of the letter of credit serve two purposes: (1) providing certainty of payment to the beneficiary and (2) allowing the issuing bank to evaluate precisely its risks under the letter of credit. It is the certainty of payment that gives the letter of credit its unique value as an instrument to secure obligations of all kinds in myriad contexts.[32] By the same token, the fact that the bank's obligation is defined solely by the terms and conditions of the letter of credit allows the bank to evaluate precisely the extent of the risks involved in its undertaking pursuant to the letter of credit. As both courts and commentators have pointed out, it is this strict construction of letters of credit which gives them their unique usefulness. Thus, the Third Circuit, in *Insurance Company of North America v. Heritage Bank, supra*, in a case involving nonconforming documents presented pursuant to a standby letter of credit securing an appeal bond, stated (595 F.2d at 175–76):

It might seem harsh for INA in the end to pay its obligation under the appeal bond yet to be left without recourse against Heritage, which originally supplied the guaranty that induced it to sign as surety on that bond. In that the letter of credit called for INA to produce a document that was to be prepared by it, however, INA must itself assume the responsibility for this unfortunate result. Moreover, the alternative suggested by INA—that the Court overlook the deficiencies in INA's demand and place the burden of the loss upon Heritage, its guarantor—imposes upon Heritage more than it bargained for in its letter of credit. And, most importantly, such alternative would threaten the foundation upon which the letter of credit has grown and flourished. For, essential to the viability

of this device is the certainty that it provides. Just as the beneficiary is induced to enter the underlying transaction because it is assured payment under specific terms agreeable to it, so too the bank assumes a primary obligation in part because its commitment is clearly defined within the four corners of the letter. If courts deviate from the rule of strict compliance and insist in certain undefined situations that banks make payments notwithstanding the fact that the beneficiary failed to comply with the terms stipulated in the letter of credit, the certainty that makes this device so attractive and useful may well be undermined, with the result that banks may become reluctant to assume the additional risks of litigation.

In a similar vein, Henry Harfield, one of the leading commentators on letter of credit law, has written:

A letter of credit contract is strictly construed. There is no room for modification, reformation, or interpolation. Paradoxically, this rigidity of construction is essential to the achievement of flexibility in the use of the instrument. Letters of credit may readily be adapted to provide financial support for any transaction. A responsible issuer cannot prudently provide this support without a precise evaluation of the risks involved. These risks . . . involve potential liability to at least two parties: the beneficiary of the credit and the party for whose account the credit is issued. Under these circumstances the issuer . . . of a credit must know who does what and with whom, and must be sure that his expectations in that regard will not be altered.

H. Harfield, Letters of Credit 2 (1979).

The rule of strict compliance is seemingly most often discussed in connection with nonconforming documents. For example, in *Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802 (4th

---

**32.** *See, e.g., Insurance Co. of North America*, 595 F.2d 171, 175–76 (3d Cir. 1979). *See also* B. Kozolchyk, Commercial Letters of Credit. in the Americas § 18.04[1], at 394–95 (1966),

quoted in *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 16 (2d Cir. 1979): "The financial value of the letter of credit promise is predicated upon its degree of legal certainty."

Cir. 1975), the issuer dishonored a draft because the draft did not comply with the letter of credit's condition that the draft be accompanied by a commercial invoice in triplicate stating that it covered "100% acrylic yarn." Instead, the invoices accompanying the draft stated that the goods were "Imported Acrylic Yarn." However, stapled to the invoices were packing lists indicating on their faces that the packages contained 100% acrylic yarn. The district court concluded that the draft complied with the letter of credit when each invoice was read together with the packing list stapled to it. The Fourth Circuit reversed, however, holding that the beneficiary had to be held to a standard of strict compliance with the terms and conditions of the letter of credit.

The question arises as to whether, when a beneficiary fails to comply with the expiration date of a letter of credit, it is any harsher to uphold a bank's dishonor on the basis of such noncompliance than it is to uphold dishonor on the basis of a seemingly minor nonconformity in the documents presented. In some instances, the expiration date may be a more crucial condition than any other. In *Bank of America National Trust & Savings Ass'n v. Liberty National Bank & Trust Co.*, 116 F.Supp. 233, 243 (W.D.Okl.1953), aff'd, 218 F.2d 831 (10th Cir. 1955), the district court wrote: "[T]he time set for the letter of credit to be in effect, both as to shipment and draft negotiation, are probably the most important and material requirements in regard to the relative rights of the parties set down by the letter of credit." (Footnote omitted.) In affirming the decision of the district court, the Tenth Circuit stated (218 F.2d at 840–41):

> [W]here a date is fixed in a letter of credit for its expiration, such provision becomes an important condition, and there must be strict compliance with it before there can be liability on the part of a bank issuing the letter. This draft was drawn after the expiration date fixed in the letter of credit and therefore Liberty National was not obligated by the letter to honor the draft.

Additionally, in *G. Jaris & Co. v. Banque D'Athenes*, 246 Mass. 546, 141 N.E. 576, 577 (1923), the Court wrote:

> Where a date is fixed as the time for the expiration of a letter of credit, that becomes an important and essential condition. There must be strict compliance with it before there can be liability on the part of the bank issuing the letter of credit.

*See also Cypress Bank v. Southwestern Bell Telephone Co.*, 610 S.W.2d 185, 187 (Tex. Civ.App.1980); *Siderius v. Wallace*, 583 S.W.2d 852, 860 (Tex.Civ.App.1979).

None of the four cases last cited above involved drafts which were proven to have been drawn and mailed in time to reach the issuer before the expiration date; rather, in one or more of those cases, the drafts were drawn and mailed after the expiration date and in others it is not entirely clear when the drafts were sent. Thus, those four cases differ in fact from the within case in which Consolidated timely mailed the requisite documents to the Bank as the issuer of the standby credit and the late arrival of the same was due solely to the fault of the postal authorities. Nevertheless, the fundamental underlying rationale behind the rule of strict compliance with the expiration date of a letter of credit would appear to be applicable herein. That rationale is founded upon certainty and allocation of risk. The expiration date fixes with certainty the liability of the issuing bank. Before the expiration date, the bank has an absolute, unconditional obligation to pay provided that the beneficiary complies with the terms and conditions of the letter of credit. After that date, however, the bank has no obligation to pay. "It is only reasonable that the expiration date under an irrevocable letter of credit fix with certainty the relative liability of all parties." *Bank of America National Trust & Savings Ass'n v. Liberty National Bank & Trust Co., supra*, 116 F.Supp. at 244. "The date on or before which the liability of the drawer of the letter of credit shall become fixed is as [a] matter of natural inference the important date to all par-

ties. . . . The liability of the [bank] cease[s] on that date if not fixed before then by presentment and demand." *G. Jaris & Co. v. Banque D'Athenes, supra*, 141 N.E. at 577. The value of the letter of credit to the beneficiary is the certainty of payment upon compliance with the terms and conditions of the credit. In return for that certainty of payment, however, the beneficiary properly bears the risk of noncompliance *in any respect.* The bank, on the other hand, assumes a great exposure during the period the credit is irrevocable (*i.e.*, up to and including the expiration date): upon compliance by the beneficiary, the bank *must pay.* Balancing that exposure, however, is the rule of strict compliance and the temporal limitation of that exposure established by the expiration date.

Harfield recognizes the necessity of strict compliance with the time for presentment specified in the credit.

> An irrevocable letter of credit conveys the absolute obligation of the issuer to honor a proper demand by the beneficiary. The beneficiary, on the other hand, owes no duty to the issuer to invoke discharge of that obligation. The issuer, therefore, is entitled to insist upon precise performance by the beneficiary of whatever terms are specified in the credit. Any requirement that the issuer accept other than literal compliance with the terms of the credit would impose on the issuer an obligation he did not undertake and would jeopardize his right to indemnity from the party for whose account the credit was issued. Accordingly, a beneficiary's entitlement to payment is dependent upon strict performance of every term of the credit; "There is no room for documents which are almost the same or which will do just as

well," *nor for deviation from any other condition, such as the time allowed for negotiation or presentment*, the place of any performance, or the identity of the person entitled to enforce the issuer's promise. The common law requirements (codified in the UCC) that emphasize formalism are arbitrary but they are not capricious.

H. Harfield, Letters of Credit 51 (1979) (emphasis added) (footnote omitted).

Because the importance and value of the letter of credit as an instrument to secure obligations of all kinds is embodied in the twin certainties of payment to the beneficiary and of exposure to the issuer which it provides, it is necessary in considering whether or not to apply a particular rule to letters of credit, to ask whether or not the application of such rule in a given instance will or will not promote those certainties. On the other hand, the primary importance and value of a negotiable instrument is its negotiability.[33] Thus, in adopting the reasonable diligence standard, the court in *The Windham Bank* was concerned at least in part that a contrary rule would inhibit the negotiability of commercial instruments during the period immediately preceding their maturity. In rejecting a rule proposed by the defendant in that case which would have required the holder to forward a draft for payment at a sufficiently early date to enable the holder to ascertain whether or not the draft had reached the place of presentment in time for the holder timely to forward another substitute draft if necessary, the court stated that such a rule "would . . . be the means of restraining the transfer of such paper within such a limited time as to impair, if not destroy, its usefulness and value, arising out of its negotiable quality." 22 Conn. at 223. How-

---

**33.** *See, e.g.*, 2 A. Squillante & J. Fonseca, The Law of Modern Commercial Practices § 5:3, at 7–10 (Rev. ed. 1981). While certainty of payment is of course an important feature of a negotiable instrument, and while certainty of payment clearly contributes to the negotiability of such an instrument, such certainty of payment, in the case of a negotiable instrument, arises from the fact that the instrument has been *negotiated* to one who qualifies as a hold-

er in due course, *see* UCC §§ 3–202, 3–302 & 3–305. In the case of a letter of credit the beneficiary can be certain of payment upon compliance with the terms and conditions of the credit regardless of negotiation, lack of good faith, or notice of claims or defenses, unless there is fraud, forgery, fraud in the transaction or the like. *See, e.g.*, UCC § 5–114(2)(b).

ever, since the unique usefulness and value of the letter of credit arises, not from the negotiability of any drafts drawn under it, but rather from the twin certainties of payment and of exposure which the letter of credit itself provides, that raison d'etre for the reasonable diligence standard is not as applicable to letters of credit. That is because while the application of a rule of strict compliance with the expiration date of a letter of credit to the presentment of drafts drawn thereunder may inhibit the negotiability of such drafts, such a standard promotes the twin certainties as to the letter of credit. If the reasonable diligence standard is applied and an issuing bank does not receive a draft or demand for payment by the expiration date of a letter of credit, then the period immediately following such expiration date will be one of uncertainty for the bank—*i.e.*, notwithstanding the expiration of the letter of credit, the bank will remain subject to liability thereunder for some indeterminate period following such expiration during which the beneficiary may still make an enforceable demand for payment provided it has exercised reasonable diligence in making presentment. That uncertainty of exposure to the issuer would appear to be particularly undesirable in connection with standby letters of credit of the type involved in this case, since a bank which issues such a credit does not expect the beneficiary to make a demand for payment in the ordinary course. Rather, the bank issuing a standby letter of credit expects to pay only if its customer defaults on the underlying obligation.[34] Thus, in the case of standby letters of credit, it will generally be most important to the issuing bank to know by a fixed and certain date whether or not a proper demand for payment will be made.

Furthermore, if a draft may be presented after the expiration date of a letter of credit provided the beneficiary has exercised reasonable diligence in making such presentment, then the beneficiary will in a sense be subject to some uncertainty as to

payment because the issuer will have to determine whether or not the delay in question was reasonable—a determination which may not entirely comport with the ministerial nature of the issuer's undertaking in a letter of credit transaction.

The question arises, however, as to how such an approach jibes with the provisions of § 3–511(1) of the UCC which reads as follows:

> Delay in presentment, protest or notice of dishonor is excused when the party is without notice that it is due or when the delay is caused by circumstances beyond his control and he exercises reasonable diligence after the cause of the delay ceases to operate.

The UCC itself, however, recognizes the necessity of adhering to principles developed from the unique nature of letters of credit. UCC § 5–102(3) provides:

> This Article deals with some but not all of the rules and concepts of letters of credit as such rules or concepts have developed prior to this act or may hereafter develop. The fact that this Article states a rule does not by itself require, imply or negate application of the same or a converse rule to a situation not provided for or to a person not specified by this Article.

Official Comment 2 to UCC § 5–102 provides:

> Subsection (3) recognizes that in the present state of the law and variety of practices as to letters of credit, no statute can effectively or wisely codify all the possible law of letters of credit without stultifying further development of this useful financing device. The more important areas not covered by this Article revolve around the question of when documents in fact and in law do or do not comply with the terms of the credit. In addition such minor matters as the absence of expiration dates and the effect of extending shipment but not expiration dates are also left untouched for future adjudication. The rules embodied in the

---

**34.** *See* notes 23–28 and accompanying text *supra.*

Article can be viewed as those expressing the fundamental theories underlying letters of credit. For this reason the second sentence of subsection (3) makes explicit the court's power to apply a particular rule by analogy to cases not within its terms, or to refrain from doing so. Under Section 1–102(1) such application is to follow the canon of liberal interpretation to promote underlying purposes and policies. Since the law of letters of credit is still developing, conscious use of that canon and attention to fundamental theory by the court are peculiarly appropriate.[35] Although § 5–102(3) specifically addresses only Article 5 and not Article 3, it addresses by implication other Articles of the UCC. Section 3–511(1) does not by its terms cover the presentment of a draft drawn under a letter of credit. Thus, while the reasoning of § 5–102(3) would certainly *allow* this Court to apply § 3–511(1) to the instant situation, it does not *require* this Court to apply that Section.[36] Comment 2 to UCC § 5–102 states that in fashioning rules for letters of credit the court should pay "attention to fundamental theory."

In the within case, the letter of credit is expressly, by its own terms, made subject to the Uniform Customs.[37] UCC § 1–102(3) provides that "[t]he effect of the provisions of this Act may be varied by agreement." Thus, even if § 3–511(1) applies to the letter of credit at issue herein, if the Uniform Customs expresses a rule contrary to that section, the Uniform Customs control since the parties to the letter of credit have agreed that the credit was subject to the Uniform Customs.

The Uniform Customs do not explicitly address the issue of excuse for delay in presentment. However, the provisions of the Uniform Customs appear to lend support to the proposition that the unique nature of letters of credit dictates the adoption of a rule requiring strict compliance with expiration dates stated in them. Uniform Customs Arts. 37–39 provide in pertinent part:

Expiry date.

Article 37

All credits, whether revocable or irrevocable, must stipulate an expiry date for presentation of documents for payment, acceptance or negotiation, notwithstanding the stipulation of a latest date for shipment.

Article 38

The words "to", "until", "till", and words of similar import applying to the stipulated expiry date for presentation of documents for payment, acceptance or negotiation, or to the stipulated latest date for shipment, will be understood to include the date mentioned.

---

**35.** In *Pringle Associated Mortgage Corp. v. Southern Nat'l Bank*, 571 F.2d 871, 874 (5th Cir. 1978), the Fifth Circuit stated:

No matter how unusual the use, if the interpretation of an unambiguous letter of credit is not guided by principles developed from the unique nature of letters of credit, this species of document could lose its recognized value as a guarantee of payment.

Similarly, Harfield has written:

The letter of credit is an invaluable tool that can be employed to facilitate an unlimited variety of transactions. Its utility, however, depends upon recognition of, and sedulous attention to, its essential characteristics. The basic principles of its nature and operation can be altered or ignored only at the price of spoiling the instrument.

H. Harfield, note 5 *supra*, at 5.

**36.** Official Comment 4 to UCC § 5–112, which deals with the time allowed after presentment

for a bank to honor or reject a documentary draft or demand for payment, states that "Article 3 applies to the extent a negotiable instrument is involved." However, § 5–112 seemingly does not relate in any way to the time allowed a beneficiary to present a draft under a standby letter of credit.

**37.** The International Chamber of Commerce Banking Commission classifies standby letters of credit as falling within the definition of "documentary credits" set forth in paragraph (b) of the General Provisions and Definitions section of the Uniform Customs. *See* International Chamber of Commerce, Decisions (1975–1979) of the ICC Banking Commission 11 (Publication No. 371, 1980). However, the Commission has also indicated that such credits should expressly be made subject to the Uniform Customs. *Id.* The within credit document does just that.

Article 39

a. When the stipulated expiry date falls on a day on which banks are closed for reasons other than those mentioned in Article 11, the expiry date will be extended until the first following business day.

\* \* \* \* \* \*

c. Banks, paying, accepting or negotiating on such extended expiry date must add to the documents their certification in the following wording:

"Presented for payment (or acceptance or negotiation as the case may be) within the expiry date extended in accordance with Article 39 of the Uniform Customs".

The above quoted sentences do not specifically address the issue of whether presentment after the expiration date of a letter of credit is or is not excusable. But those sections do imply that the expiration date must be strictly complied with. Otherwise, it would appear unnecessary to require a bank to add to documents the certification stated in Art. 39(c).

Art. 10 provides:

Banks assume no liability or responsibility for the consequences arising out of *delay* and/or loss *in transit of any messages, letters or documents*, or for delay, mutilation or other errors arising in the transmission of cables, telegrams or telex. Banks assume no liability or responsibility for errors in translation or interpretation of technical terms, and reserve the right to transmit credit terms without translating them.

(Emphasis added.) One of the possible consequences of delay in connection with any such channel of communication is that the bank will dishonor a draft presented after the expiration date of the applicable credit even though the presenter was diligent in his use of such communication channel.

Art. 11 provides:

Banks assume no liability or responsibility for consequences arising out of the interruption of their business by Acts of God, riots, civil commotions, insurrections, wars or any other causes beyond their control or by any strikes or lockouts. Unless specifically authorised, banks will not effect payment, acceptance or negotiation *after* expiration under credits expiring during such interruption of business.

(Emphasis added.) If a bank "assume[s] no liability or responsibility for the consequences arising out of delay ... in transit of any messages, letters or documents," and if a bank is under no obligation to effect payment under a credit which has expired during a period in which the bank's business is interrupted due to causes beyond the bank's control, there would seem to be no reason why a bank should have the obligation to pay a draft presented by a beneficiary after the expiration of a credit due to delay in the mails caused by the postal authorities. If a bank does not assume the risk when a credit expires during an interruption of the bank's business due to causes beyond the bank's control and beyond the control of the beneficiary of the credit, then the bank also would not seem to have assumed the risk, in the absence of an express or implicit contractual undertaking, when a credit expires during a period in which a beneficiary's presentment is delayed due to causes beyond the beneficiary's control but in connection with an instrumentality— herein the Postal Service—chosen for use by the beneficiary. While the question is a very close one, the better answer, in this Court's view, requires that a beneficiary under a standby letter of credit must strictly comply with the expiration date of such letter of credit and that late presentment of a draft drawn under such a letter of credit may not be excused because of a delay in the mails notwithstanding the beneficiary's reasonable use of and reliance upon the mails.

Although that rule may arguably appear inequitable,[38] it accords with the basic prin-

---

**38.** Harfield has expressed "fear that the sacred cow of equity may trample the tender vines of letter-of-credit law." Harfield Code, Customs and Conscience in Letter-of-Credit law, 4 U.C. C.L.J. 7, 11 (1972), quoted in *Insurance Co. of North America v. Heritage Bank*, 595 F.2d 171, 175 (3d Cir. 1979), and also in *Chase Manhat-*

ciples of letter of credit law. "This is not a pharisaical or doctrinaire persistence in the principle [of strict compliance], but it is altogether realistic in the environs of this case; it is plainly the fair and equitable measure." *Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d at 806. In essence, what is involved in this case is a matter of allocation of risk—of weighing and balancing of interests. In concluding, as this Court does, that Consolidated should bear the risk of delay caused by the mails and that the Bank should not bear that risk, it is to be noted that Consolidated *could* have avoided subjecting itself to the risk. Certified Mail, which is handled in exactly the same manner as ordinary first class mail insofar as time for delivery is concerned,[39] was not the only means available to Consolidated for forwarding the draft and accompanying documents to the Bank. The Postal Service offers Express Mail service between St. Louis, Missouri, and Richmond, Virginia, and achieves overnight delivery approximately ninety-five percent of the time.[40] Private delivery services, such as Federal Express, offer overnight delivery between St. Louis and Richmond.[41] Federal Express achieves delivery by noon of the following business day approximately eighty percent of the time. *Id.* If unforseen problems do arise and delivery cannot be made on the following business day, Federal Express normally makes delivery on the second business day following the date of shipping.[42] Thus, had Consolidated utilized such overnight service on Wednesday, April 2, 1980, it could have called the Bank the following day, Thursday, April 3, 1980, to ascertain whether or not the draft and accompanying documents had been delivered. If not, Consolidated could have dispatched a second draft and accompanying documents by overnight service on April 3, 1980, and could have checked again with the Bank on Friday, April 4, 1980, to see whether or not either of the two drafts had been delivered, and, if not, it could have dispatched a third draft on April 4, 1980, and so on. If such a course of action had been followed, it would seem that the chances of delivery not being effectuated on or before the expiration date of the letter of credit would have been almost nil. In that connection, Sandvig testified at his deposition that drafts are typically forwarded by registered mail a week to ten days before the expiration date of the letter of credit so that if not delivered in a timely fashion, there is still time to send another draft by means of an overnight delivery service or by hand delivery.[43] All in all, it would not seem unfair or unreasonable to expect a beneficiary to utilize same-day air messenger services, *see Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 887 n.7 (3d Cir. 1977), or to bear the type of risk placed upon the beneficiary in the instant case. Accordingly, for the reasons stated in this opinion, judgment will be entered for the Bank.

---

tan Bank v. Equibank, 550 F.2d 882, 885 n.4 (3d Cir. 1977).

**39.** *See* Affidavits of Thomas J. Oswald (Doc. 13), Thomas J. Douglas (Doc. 30) and William L. Hallam (Doc. 35); Letter of Carolynne M. Seeman to William Hallam dated November 12, 1981 (Doc. 34).

**40.** *See* Affidavit of Joseph W. Lanter, Express Mail Manager for the United States Post Office in St. Louis, Missouri (Doc. 31).

**41.** *See* Affidavit of Maxine V. Hoen, Paralegal, Piper & Marbury, Baltimore, Maryland.

**42.** *See* Letter of Donna Burnett, Customer Correspondent, Customer Relations Department, Federal Express Corporation, dated November 3, 1981, and notarized November 9, 1981.

**43.** *See* Deposition of Gregory S. Sandvig at 71 (Doc. 29).